607 A.2d 204

**Robert J. MELLOW, Senator, 22nd District, J. William Lincoln, Senator 32nd District, Leonard J. Bodack, Senator, 38th District, Michael A. O'Pake, Senator, 11th District, Patrick J. Stapleton, Senator, 41st District, Jeanette F. Reibman, Senator, 18th District, Vincent J. Fumo, Senator, 1st District, and H. Craig Lewis, Senator, 6th District, Individually and in their official capacities, Appellants,**

v.

**Brenda K. MITCHELL, Acting Secretary of the Commonwealth, and William Boehm, Commissioner of the Bureau of Commissions, Elections, and Legislation, Department of State, in their official capacities only, Appellees.**

Supreme Court of Pennsylvania.

Argued March 7, 1992.

Decided March 26, 1992.

Edwin A. Abrahamsen, Lawrence J. Moran, Scranton, and Mark Packman, for petitioner.

Gregory E. Dunlap, Harrisburg, for respondents.

John P. Krill, Jr. and Stephen C. MacNett, Harrisburg, for Loeper, et al. intervenors.

Joseph W. Murphy and Charlene A. Basehore, Harrisburg, for Ryan/Cornell intervenor.

Reizdan B. Moore, Harrisburg, for O'Donnell intervenor.

Thomas D. Rees, Jeffrey L. Abrams, Norristown and Thomas R. Solomich, Pittsburgh, for Wilkes, et al. intervenors.

Charles W. Bowser, Kenneth C. Frazier, Mary E. Kohart, Philadelphia, Bridget Montgomery, Harrisburg, for Phl. Ldrsh. et al. intervenors.

Stephen B. Harris, Warrington, for Greenwood, et al. intervenors.

Joseph F. Leeson, Jr., Bethlehem, for Freeman, et al. intervenors.

Douglas P. Yauger, Pittsburgh, for Foglietta, et al. amici curiae.

## OPINION OF THE COURT

PAPADAKOS, Justice.

This case involves the redistricting of Pennsylvania's seats in the United States House of Representatives. After the 1990 census was taken, the Clerk of the United States Congress informed the Pennsylvania Secretary of State that Pennsylvania was henceforth only entitled to have twenty-one (21) seats in the United States House of Representatives, a net loss of two (2) seats or districts. From early 1991 to the present, the Pennsylvania Legislature failed to enact a 21–district reapportionment plan. On January 28, 1992, the first day for circulating nomination petitions for election to Congress (under 25 P.S. § 2868), Appellants (eight Democratic State Senators) filed an equity action in the Commonwealth Court, invoking that Court's original jurisdiction against Appellees (certain State election officials). Noting that February 18, 1992, the last day to file nomination petitions, was fast approaching, Plaintiff–Appellants asked the Commonwealth Court to declare the existing congressional apportionment law (25 P.S. § 3571) unconstitutional; to enjoin the implementation of the official congressional election schedule until a valid plan could be adopted; and to adopt a valid reapportionment plan if the Legislature was unable to do so. Senior Judge Barry of the Commonwealth Court held a prompt hearing and, on January 30, 1992, he granted a preliminary injunction on the basis that the existing 23–seat apportionment plan was

unconstitutional, enjoining the implementation of the then present schedule for electing members of Congress in Pennsylvania. Judge Barry's order required all parties and intervenors, if any, to submit their proposed reapportionment plans to the Commonwealth Court no later than February 11, 1992. His order also provided notice that the Court would select a plan if the Legislature failed to act by February 11, 1992.

As of February 12, 1992, the Legislature had failed to enact a reapportionment plan. Hence, by order of that date, the Commonwealth Court ordered final hearings to begin the next day, February 13, 1992, to receive evidence and to consider all proposed plans that had been timely filed on or before February 11, 1992. Plaintiff–Appellants presented three plans, styled Plaintiffs' Nos. 1, 2 and 3. Plaintiffs' No. 3 was later withdrawn. The Attorney General intervened and additional parties, a number of whom submitted plans of their own, were also granted intervenor status to represent the interests of specific counties or other geographical areas around the State or to protect the voting rights of African–Americans in various congressional districts. Additional details concerning these plans and other issues raised by some intervenors are addressed below.

Meanwhile, Plaintiff–Appellants applied to this Court to take plenary jurisdiction of the matter. By order of February 13, 1992, this Court exercised such plenary jurisdiction. We designated President Judge David W. Craig of the Commonwealth Court as Master to conduct hearings and report to us not later than February 26, 1992. The hearings before the Commonwealth Court began on February 13 and were concluded on February 15. Judge Craig's "Findings, Recommended Decision and Form Order," along with a proposed election schedule revision were filed with this Court on February 24, 1992, and a copy thereof is attached to this Opinion as Appendix A. Subsequently, exceptions to Judge Craig's Findings and briefs were filed with this Court and oral arguments were held on Saturday, March 7, 1992,

in Pittsburgh. We issued a Per Curiam Order on March 10, 1992, adopting Judge Craig's Findings, Recommended Decision and Form of Order, along with our "Revised Election Calendar" and dismissing all exceptions thereto. A copy of our Order is attached hereto as Appendix B. This Opinion explains our disposition of this matter.

Judge Craig's Recommended Decision (Appendix A) compares and evaluates the six different plans timely submitted to him. The plans scrutinized were Plaintiffs' No. 1 and No. 2; two plans styled O'Donnell A and O'Donnell B (both submitted by Speaker of the House Robert W. O'Donnell and seven other Democratic members of the Pennsylvania House of Representatives); the "Murtha–McDade" Plan (a "bi-partisan" plan submitted by Congressmen John P. Murtha, Joseph M. McDade and nine other incumbent members of Pennsylvania's congressional delegation); and a plan styled "Loeper 1" (submitted by Senate Majority Leader F. Joseph Loeper and five other Republican State Senators). Plans filed after the February 11 deadline, including the "Ryan–Cornell" plan submitted by two Republican members of the Pennsylvania House—Matthew J. Ryan and Roy W. Cornell, and an amended version of the Loeper plan ("Loeper 2") were properly not considered by Judge Craig. As he pointed out, the various parties had many months to formulate their plans, and to have allowed consideration of plans, amendments or revisions submitted late would have created the potential of endless proceedings. Thus, Judge Craig was absolutely correct in adhering to the pre-announced deadline of February 11.

Judge Craig correctly notes that federal law requires, primarily, that districts be equal in population to the greatest practical extent. Slight departures from mathematical perfection have been justified by the federal courts only to advance the cause of equality in the following respects: avoiding fragmentation of local government territories and the splitting of election precincts; effectuating adequate representation of a minority group; creating compact and contiguous districts; maintaining relationships of shared

community interests; and not unduly departing from the useful familiarity of existing districts. Finding of Fact No. 16 in Judge Craig's Recommended Decision (see Appendix A) is a table with nine columns summarizing the six competing plans.

After a detailed analysis of regional concerns, Judge Craig recommended approval of Plaintiffs' Plan No. 2 because it: (1) has a low maximum population deviation; (2) is consistent with minimal splitting of precincts; (3) achieves an enlarged number of two congressional districts with a majority of African–American population; and (4) comes closest to implementing the community-of-interest factors in those regions across the State which have identified them. While the Murtha–McDade Plan achieved remarkable mathematical exactitude, it splits twenty-two (22) election precincts and twenty-seven (27) local governments. Next in mathematical exactitude, and both meeting constitutional standards, are O'Donnell Plan B and Plaintiffs' No. 2, respectively. Unlike O'Donnell Plan B, Plaintiffs' Plans No. 1 and 2 would achieve the goal of forming two black majority congressional districts, thought possible and, hence, constitutionally necessary in light of Pennsylvania's 9% African–American population, by increasing the African–American population in the First Congressional District to 52.4% while maintaining a strong majority African–American population of 62.242% in the Second Congressional District.

Numerous exceptions to Judge Craig's report, and submissions from other interested persons objecting to aspects of the report, have been filed with this Court. They are set forth in full in Appendix C to this Opinion. We have consolidated them into the various legal issues raised and we will now address said issues.

### I. Population Deviations

A number of exceptions filed contend that Judge Craig erred in recommending Plaintiffs' Plan No. 2 because that plan has a higher maximum total deviation than two other

plans. In *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), the United States Supreme Court held that congressional districts within a state must have equal numbers of people based on the "one man, one vote" principle. 376 U.S. at 7–8, 84 S.Ct. at 529–30. While *Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), stands for mathematical absolutism in congressional reapportionment, the court has since conceded that "precise mathematical equality ... may be impossible to achieve in an imperfect world...." *Karcher v. Daggett*, 462 U.S. 725, 730, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983). Consequently, the Constitution requires only that "districts be apportioned to achieve population equality 'as nearly as is practicable.'" *Karcher, supra*, 462 U.S. at 730, 103 S.Ct. at 2658.

 To determine whether the maximum total deviation of a plan satisfies the "one person, one vote" standard, the United States Supreme Court has established a two-part test. *Karcher, supra*, 462 U.S. at 730, 103 S.Ct. at 2658. First, the party challenging a redistricting plan must show that "the population differences among districts could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal population." *Karcher, supra*, 462 U.S. at 730, 103 S.Ct. at 2658. As Judge Craig correctly stated, however, "a plan is not per se unconstitutional just because a smaller population deviation could be achieved." Recommended Decision at 12; see also, *Karcher, supra*, 462 U.S. at 740, 103 S.Ct. at 2663 ("By itself, ... [appellees' showing that the Feldman Plan did not come as nearly as practicable to population equality] does not establish that the Feldman Plan is unconstitutional.") Rather, the existence of plans with smaller deviations simply obligates a court to apply the second part of the test, *i.e.*, to ask whether the proponent of the plan can show that "each significant variance between districts was necessary to achieve some legitimate goal." *Karcher, supra*, 462 U.S. at 731, 103 S.Ct. at 2658; *see, id.*, at 740, 103 S.Ct. at 2663 (showing that plan could have had smaller deviations

"means only that the burden shifted to the State to prove that the population deviations in its plan were necessary to achieve some legitimate state objective").

Among the "legitimate state objective[s]" identified by the Court in *Karcher v. Daggett* were "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." *Id.* at 740, 103 S.Ct. at 2663. *See, e.g., Turner v. State of Arkansas,* 784 F.Supp. 553 (E.D.Ark.1991) (upholding congressional reapportionment plan which contained a 0.73% deviation, even though six other plans had smaller deviations, because variance achieved the legitimate state objective of attempting, to the extent possible, to keep counties and voters in the same district to which they had been assigned under the prior redistricting plan); *Stone v. Hechler,* 782 F.Supp. 1116 (N.D.W.Va.1992) (upholding congressional redistricting plan with deviation of 0.09% because it served goals of "preserving the cores of previous districts and maintaining district compactness;" court reasoned that "[t]he smaller the population deviation, the greater the importance of the State's interests, and the more consistently the plan as a whole reflects the State's interest, the smaller the State's burden of proof."); *Wilson v. Eu,* 1 Cal. 4th 707, 4 Cal.Rptr.2d 379, 823 P.2d 545 (1992) ("the need to form reasonably compact districts, to use census tracts rather than blocks in forming districts ... and to comply with the Voting Rights Act," justified a maximum range in the Congressional Plan of 0.25%).

■ Consistent with this body of cases,[1] Judge Craig properly held that the extremely small deviations in district populations may be justified by, inter alia, a desire to avoid splitting of political subdivisions and precincts, to provide

1. Judge Craig relied on earlier cases, to wit, *Shayer v. Kirkpatrick,* 541 F.Supp. 922 (1982), *aff'd. sub nom., Schatzle v. Kirkpatrick,* 456 U.S. 966, 102 S.Ct. 2228, 72 L.Ed.2d 841 (1982); *Carstens v. Lamm,* 543 F.Supp. 68 (1982); *Dunnell v. Austin,* 344 F.Supp. 210 (1972).

adequate representation to a minority group, and/or to preserve communities of interest.

■ Judge Craig also properly held that Plaintiffs' Plan No. 2 inherently satisfies the "one person, one vote" requirement. That plan has a total maximum deviation of only 0.0111%. This deviation is smaller than those upheld in *Turner, Stone* and *Wilson,* and is fully justified by the policy of preserving the boundaries of municipalities and precincts. Plaintiffs' witness Mark McKillop, who supervised the drawing of the plan, testified that "[W]e did not feel that splitting a lot of municipalities would serve a purpose," and that eliminating all the deviations in Plaintiffs' Plan No. 2 "would [have] mean[t] additional municipal and voting district splits." Tr., Vol. I, p. 58. Thus, Plaintiffs' Plan No. 2 splits only nineteen (19) counties, eight (8) localities, and three (3) precincts—a smaller number than either O'Donnell Plan A, Loeper Plan 1, or the mathematically exact Murtha–McDade Plan.[2] In short, Judge Craig sensibly held that Plaintiffs' Plan No. 2 satisfied the "one person, one vote" requirement, and the Intervenors' arguments to the contrary must be rejected.

## II. Section 2 of the Voting Rights Act

■ At the beginning of the hearings, Judge Craig stated one factor that he would consider was "whether the plans operate to dilute the voting impact of any minority." Tr., Vol. I, p. 11. After evaluating the various plans with this factor in mind, Judge Craig ruled that Plaintiffs' Plan No. 2 best protected minority voting rights. We agree. Judge Craig must be affirmed based on the evidence adduced at the hearings that: (a) Plaintiffs' Plan No. 2 did *not* effectively dilute minority voting strength in the Second Congressional District, and (b) all plans except Plaintiffs' Plan

**2.** The only plan that split fewer precincts and political subdivisions than Plaintiffs' Plan No. 2 was O'Donnell Plan B, which also had a slightly lower deviation. As shown below, however, this plan failed to give adequate recognition to minority voting strength in Philadelphia, since it created only one district with an African–American majority, whereas Plaintiffs' Plan No. 2 created two such districts.

54

No. 2 *did* dilute minority voting strength in the First Congressional District.

The primary tool for preventing minority voting dilution is Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. As amended in 1982, Section 2(a) prohibits any state law or practice which "results in a denial or abridgement of the right ... to vote on account of race...." 42 U.S.C. § 1973(a). Section 2(b) provides that:

A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the state or political subdivision are not equally open to participation by members of the class of citizens protected by subsection (a) of this section in that *its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.* The extent to which members of a protected class have been elected to office in the state or political subdivision is one circumstance which may be considered. *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b) (emphasis added).

All parties submitted plans that decreased the African–American percentage in the Second Congressional District (which is currently about 81% African–American in total population) and increased it in the First (which is currently 34% African–American). Plaintiffs' Plan No. 2 made both districts over 50% African–American in total population, with the First Congressional District at 52.4% and the Second Congressional District at 62.242%. The evidence showed that both Districts would henceforth give African–Americans the opportunity to elect candidates of their choice. Tr., Vol. I, pp. 71–72. There is no evidence that any other plan provided such an opportunity. The issue that divided the various parties was whether Plaintiffs' Plan No. 2 lowered the African–American percentage too much

in the Second Congressional District thereby depriving African-American voters of their opportunity to participate in the political process and elect candidates of their choice.

Plaintiffs' Plan No. 2 creates a so-called "super-majority" African-American district of 62.242% in the Second Congressional District. Recommended Decision, at 25. This district is an "effective" minority district, *i.e.*, one that will provide African-American voters an opportunity to continue to elect a representative of their choice. Tr., Vol. I, pp. 71-72.

■ Although it has been argued that the Second Congressional District should have a total African-American population closer to 70%, Judge Craig properly found that "The record here contains no evidence that 65% to 62% would risk minority group effectiveness...." Recommended Decision, at 25. Moreover, the cases in this Court and others confirm that Plaintiffs' 62% African-American district will not dilute minority voting rights. This Court recently affirmed a legislative reapportionment plan which contained four State Senate Districts with a 60% African-American total population in each. *In re: Pennsylvania Legislative Reapportionment Commission,* 530 Pa. 335, 609 A.2d 132 (1992). A voting analysis in that case indicated that the participation rate of African-Americans exceeded that of whites in Democratic primary elections in Philadelphia and that there is considerable "crossover" voting by whites for Democratic African-American candidates in Philadelphia. Based on these facts, the analysis concluded that a district with a total African-American population of approximately 60%, or a voting age population in the high 50's, would provide African-American voters a viable opportunity to elect candidates of their choice.

Other courts have approved districts with African-American total populations well below 65%. For example, in *Jordan v. Winter,* 604 F.Supp. 807 (N.D.Miss.) *aff'd,* 469 U.S. 1002, 105 S.Ct. 416, 83 L.Ed.2d 343 (1984), the court ordered into effect a redistricting plan for Mississippi that established one congressional district with an African-

American total population of 58.3%. The court rejected the plaintiffs' arguments that this percentage was too small to enable African–Americans to elect a representative of their choice and that a district with a voting age population of at least 60% African–American was necessary. *Id.* at 814. This district, in 1986, elected Mississippi's first African–American congressman since Reconstruction.

Similarly, in *James v. City of Sarasota,* 611 F.Supp. 25, 28 (M.D.Fla.1985), the court held that a district containing a 50.1% African–American total population and a 42.6 voting age African–American population was sufficient for purposes of Section 2, despite the existence of white bloc voting, because minority voter turnout had historically exceeded that of whites in the district. The Department of Justice, in a letter to the court, noted that:

... figures on minority voting-age populations [are] far more useful to the analysis than total minority population percentages. But in neither case do we attach particular significance to a 65 percent population figure, and no attempt is made to add arbitrarily increments of five percentage points each to compensate for age, registration and turn-out differences.

Accordingly, the Attorney General has frequently concluded, based on the facts presented in a particular submission, that districts containing a minority population significantly less than 65 percent of the total are racially fair districts and that the plan submitted is entitled to Section 5 preclearance.

611 F.Supp. at 32 and 33.

█ In short, there is no legal requirement either in the courts of the Commonwealth or the federal courts, that a district have a 65% African–American total population to satisfy Section 2. The arguments to the contrary must, therefore, be rejected.

In *Thornburgh v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the United States Supreme Court stated that "Dilution of racial minority group voting strength may be caused by the dispersal of blacks into districts in which

they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." 478 U.S. at 46, n. 11, 106 S.Ct. at 2764, n. 11. Here, other plans concentrate African–American voters into the Second Congressional District thereby diluting the voting strength of African–American voters in the First Congressional District.

The justification advanced for this dilution has been that the Second Congressional District had to be over 65% in order to protect the incumbent. Such a justification, however, does not mandate making the Second Congressional District almost 70% African–American when the result is to dilute African–American voting strength in the neighboring First District, which is only 46.76% African–American under the Loeper Plan and even less under both O'Donnell Plans and the Murtha–McDade Plan. Although incumbency protection is not in and of itself an inappropriate consideration, it may not be accomplished at the expense of minority voting potential. *Garza v. County of Los Angeles*, 918 F.2d 763, 771 (9th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991). There is no statistical evidence indicating that a 70% African–American district is necessary to provide the African–American community an equal opportunity to elect a representative of their choice. To the contrary, the evidence shows that a 62% African–American district would suffice. The effect of creating a concentrated Second Congressional District is to dilute impermissibly the voting strength of minorities in the adjacent First Congressional District. *See, Williams v. City of Dallas*, 734 F.Supp. 1317, 1415 (N.D.Tex.1990). We think that Judge Craig made a sound, lawful choice under these facts and circumstances, and we adopt it as our own.[3]

---

3. The Loeper Intervenors also argue that Plaintiffs' Plan No. 2 reduces the African–American population in Congressional District 14 (Pittsburgh) from 23% to 17.81% and that Judge Craig improperly failed to make findings that these reductions would be harmless to minority voters in Allegheny County. This argument must be rejected. Neither the Loeper Intervenors nor anyone else has offered any evidence regarding the degree of influence presently enjoyed by minority voters

58

### III. Additional Criteria

#### A. Plaintiffs' Plan No. 2 is Politically Fair

Plaintiffs' Plan No. 2 results in a politically fair balance in the Pennsylvania delegation between Democrats and Republicans. Pennsylvania is losing two (2) seats, and Plaintiffs' Plan No. 2 divides the loss evenly. Consequently, the estimated political party balance will be ten (10) Democratic and eleven (11) Republican districts. The other plans submitted to this Court appear to strike a similar political balance.

#### B. Plaintiffs' Plan No. 2 Splits a Minimum Number of Municipalities and Precincts

Any municipality or precinct splits in Plaintiffs' Plan No. 2 were necessary to comply with applicable state and federal legal requirements concerning the "one person, one vote" standard or minority voting rights. As discussed above, Plaintiffs' Plan No. 2 splits far fewer precincts and municipalities than either the mathematically exact Murtha–McDade or the Loeper Plan, and splits about the same number as the O'Donnell Plans. We are sympathetic to those Intervenors, or parties who filed amicus briefs with this Court, complaining of county, municipality or precinct splits in their areas. We think, however, that some such splitting is inevitable and that Plaintiffs' Plan No. 2 eliminates these defects to the maximum degree possible.

### IV. The February 11, 1992 Deadline

We repeat what we stated above. Judge Craig's rigid adherence to the February 11, 1992, deadline was absolutely correct. The parties complaining had ample notice of the deadline and should have been well aware of its importance as they would be of any statute of limitations or other judicial order imposing a time deadline. Not to ad-

in Allegheny County, much less any evidence that such influence would be impaired by the small reduction in the African–American percentage in a district that already has a relatively small African–American population.

here to the deadline imposed would create or would have created chaos and we will not countenance such a result.

For the reasons set forth above, we have adopted Judge Craig's "Findings, Recommended Decision and Form of Order" and dismissed all exceptions filed to it.

APPENDIX A TO OPINION OF THE COURT

## FINDINGS, RECOMMENDED DECISION AND FORM OF ORDER

By President Judge David W. Craig Commonwealth Court of Pennsylvania

FILED: February 24, 1992

This case involves some feats of modern computer technology, by which one plan has been able to reapportion Pennsylvania's 1990 population of 11,881,643 persons with ultimate mathematical precision among 21 proposed congressional districts so that the average deviation from the ideally equal district population of 565,793 is *less than 1 person.*

Where the task of selecting among at least six reapportionment plans has fallen to the judiciary because the General Assembly has not acted, does the constitutional principle requiring district population equality "as nearly as is practicable....," *Wesberry v. Sanders,* 376 U.S. 1, 7–8, 84 S.Ct. 526, 530, 11 L.Ed.2d 481 (1964), mandate acceptance of only a mathematically absolute plan?

Or is some departure from mathematical perfection warranted by concerns about whether the proposed congressional districts

—are compact and contiguous,

—facilitate community-of-interest concerns of minority groups and of areas having regional ties, and

—minimize fragmentation of municipalities and voting precincts,

to provide reassurance that gerrymandering is not involved?

## PROCEDURAL HISTORY [1]

(1) On December 31, 1990, after the 1990 decennial census count established Pennsylvania's population, at the point of counting, to be 11,881,643, the Clerk of the U.S. Congress issued a Certificate of Entitlement to the Pennsylvania Secretary of the Commonwealth entitling the Commonwealth henceforth to have only 21 districts, a loss of 2 seats below the 23 districts established by the General Assembly in 1981. 25 P.S. § 3571.

(2) During 1991 and in 1992 until the present, efforts of Pennsylvania's legislators to enact a new 21–district reapportionment statute fell short of the votes needed for passage in both houses.

(3) On January 28, 1992, the first day for circulating nomination petitions for election to the U.S. Congress, 25 P.S. § 2868, eight Democratic state senators [2] filed this equity action in the original jurisdiction of the Commonwealth Court against Pennsylvania's state election officials.[3]

The pleadings noted that the last day for filing nomination petitions, February 18, 1992, was fast approaching, and the plaintiffs requested this court

—to declare the existing congressional apportionment law, 25 P.S. § 3571, to be unconstitutional, as in violation of art. 1, § 2 of the U.S. Constitution,

—to enjoin the implementation of the official election schedule as to the congressional election until a valid plan is adopted, and

1. Each numbered paragraph is a finding of fact. Unnumbered paragraphs embody description of the content of pleadings, the content of the docket and discussion.

2. Robert J. Mellow, J. William Lincoln, Leonard J. Bodack, Michael A. O'Pake, Patrick J. Stapleton, Jeanette F. Reibman, Vincent J. Fumo and H. Craig Lewis.

3. Acting secretary of the Commonwealth Brenda K. Mitchell, Elections Commissioner William Boehm and the Pennsylvania Department of State.

—to adopt a valid reapportionment plan if the legislature continues to be unable to do so.

Senior Judge Barry of the Commonwealth Court held a prompt hearing on the plaintiffs' application for a preliminary injunction with respect to the relief requested.

(4) The pre-existing congressional districts now depart from the ideal population of 565,793 per district by as much as 19.89% below that figure (present 14th District with 112,514 fewer persons) and as much as 3.76% above the ideal figure (present 16th District with 21,255 persons above the ideal).

Of course, the underpopulation of most existing districts is exacerbated by the fact that there are 23 of them, instead of just 21 districts, on which the ideal population is based.

On January 30, 1992, Judge Barry granted a preliminary injunction on the basis that the present apportionment is unconstitutional, enjoining the implementation of the present schedule for electing members of Congress in Pennsylvania.

The order retained jurisdiction and required all parties and intervenors, if any, to submit their proposed reapportionment plans to this court not later than February 11, 1992.

Finally, Judge Barry's order advised that the court would select a plan for adoption and implementation if the General Assembly had not enacted a valid 21–district plan by February 11, 1992.

(5) As of February 12, 1992, the legislature had not enacted any reapportionment plan for Pennsylvania.

Hence, by order of that date, the Commonwealth Court directed final hearings to begin on the following day, Thursday, February 13, 1992, to receive evidence and to consider all proposed plans which had been timely filed on or before February 11.

In the meantime, the plaintiffs presented 3 plans, called Plaintiffs 1, 2 and 3. The Attorney General intervened, and additional parties were granted intervention as follows.

(6) Eight Democratic members of the Pennsylvania House of Representatives[4] intervened and timely filed 2 plans, called O'Donnell A and O'Donnell B.

(7) Representative Harold James of the Pennsylvania House of Representatives also timely filed a plan, the Hughes Plan, which, although in the form of a statewide bill, seeks political effectuation of African–American interests in congressional districts in Philadelphia.

(8) Two members of Pennsylvania's congressional delegation, Congressmen Joseph M. McDade and John P. Murtha, intervened and timely presented a plan, the Murtha–McDade Plan, prepared on behalf of 11 members of the present Pennsylvania congressional delegation.

(9) Six Republican state senators[5] intervened and timely filed a plan, called Loeper 1.

(10) Four groups of intervenors, persons concerned with maintaining congressional district configurations, also intervened with reference to Bucks County, Cumberland County, Berks and Schuylkill Counties, and the Lehigh Valley, involving Lehigh and Northampton Counties. These parties proposed to support certain statewide plans and to oppose other plans.

(11) On February 12, 1992, after the expiration of the February 11 deadline set by Judge Barry's order, two Republican members of the Pennsylvania House of Representatives, Matthew J. Ryan and Roy W. Cornell, intervened, but the plan they filed had to be deemed not timely in accordance with this court's order.

4. Robert W. O'Donnell, H. William DeWeese, Allen G. Kukovich, Dwight Evans, Frank Oliver, Thomas Michlovic, Gordon Linton and Harold James.

5. F. Joseph Loeper, Robert C. Jubelirer, D. Michael Fisher, Charles Lemmond, Hank Salvatore, Noah Wenger.

(12) Finally, after February 11, 1992, intervention also was obtained by Albert Swann, together with the Frederick Douglas Society and Philadelphia Leadership Conference, with a petition expressly supporting a proposal to establish an additional congressional district in which the African–American population would be a majority group, over and above the one district (the Second) now having a majority Black population.

(13) Congressman Lucien Blackwell, who sought intervention after the record was closed, was allowed intervention limited to the filing of a brief.

The plaintiffs had applied to the Pennsylvania Supreme Court to take plenary jurisdiction and had also filed a companion action in the United States District Court for the Middle District of Pennsylvania.

During the course of the three days of hearings in the Commonwealth Court, the Pennsylvania Supreme Court, by order of February 13, adopted a sound course for expediting the matter—and obviating the delay which could be incurred by the course of an appeal-of-right taken from the Commonwealth Court to the Supreme Court—by taking plenary jurisdiction, designating President Judge David W. Craig of the Commonwealth Court as Master to conduct the hearings and report to the Supreme Court not later than Wednesday, February 26, 1992 with findings, a recommended decision and a form of order.

Judge Sylvia Rambo of the United States District Court for the Middle District of Pennsylvania advised that the district court would await state court action providing that the Commonwealth Court had acted by Monday, February 24, 1992 (the date on which these findings, recommended decision and form of order are being filed).

The hearings by the Commonwealth Court, begun on Thursday, February 13, were concluded on Saturday, February 15, at which time the election administrators agreed to file a proposed election schedule revision with the Commonwealth Court by February 19, with briefs to be filed by

regional parties on Thursday, February 20, and by state-wide parties on Friday, February 21.

(14) During the course of the three days of hearings, the plaintiffs withdrew Plaintiffs' Plan 3.

(15) The Republican state senators sought to present an amended version of Loeper Plan 1, which amendment is referred to as Loeper Plan 2 in the record. Having *deferred* ruling on its admission for consideration as a state-wide plan, the President Judge ruled at the close of the evidence that such amended plan, Loeper 2, was not entitled to consideration as a separate plan because *it had not been timely filed by February 11,* but held that testimony concerning it was *admissible as evidence relevant to the evaluation of all other plans.*

The President Judge did not reverse any ruling, but only deferred ruling to provide maximum consideration, even as to untimely filings.

### Exclusion of Untimely Plan Filings

Enforcement of the February 11 filing deadline with respect to statewide proposals has been necessary to assure that the courts would have a reasonable opportunity to consider the plans which were timely filed.

All parties have had *many months* to prepare a proper plan.

If the court had opened this time-constrained case to late plans and amendments filed after the February 11 deadline plainly stated in Judge Barry's order, the proceedings would have been endless because (1) new intervenors would have required many new plans to be reviewed, and (2) the earlier parties could have amended their timely plans repeatedly, to surpass the new plans.

Hence, the late amendment of the Loeper Plan was excluded, although Loeper counsel was allotted full participation and the amended data was received in Court Exh. AA.

Similarly, the Ryan–Cornell Plan proponents were accorded status as parties with full participation in cross-examination. Ryan Plan data was received in Court Exh. AA.

Exclusion of full consideration of the Ryan Plan was justified because that plan was in existence on and before February 11. There was no reason that the plan could not have been timely presented. It was knowingly withheld from being filed in the court on that date, on the ground that further legislative action then was possible.

The President Judge did not exclude plans on the basis of political party. The President Judge excluded *all* untimely proposals and considered all timely ones of all parties.

## THE CONTROLLING CONSTITUTIONAL PRINCIPLES

Below, as Finding No. 16, a factual comparison of the plans will be presented. Before considering that finding and other facts constituting the minor premises of the logic involved, reference to the constitutional principles, as enunciated by the United States Supreme Court, is necessary.

### *Equality of Congressional District Populations* *One Person, One Vote*

Congressional redistricting becomes a judicial responsibility only when, as here, the state legislature has not acted after having had an adequate opportunity to do so. *White v. Weiser*, 412 U.S. 783, 794–95, 93 S.Ct. 2348, 2354–55, 37 L.Ed.2d 335 (1973), *Reynolds v. Sims*, 377 U.S. 533, 586, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1964).

In applying art. I, § 2 of the U.S. Constitution, the United States Supreme Court has held, as noted above, that the goal is to make "as nearly as is practicable one man's vote in a congressional election . . . worth as much as another's." *Wesberry.*

This requirement is the "preeminent if not the sole, criterion" for appraising the validity of redistricting plans. *Chapman v. Meier*, 420 U.S. 1, 23, 95 S.Ct. 751, 764, 42 L.Ed.2d 766 (1964).

The United States Supreme Court has declined to adopt any particular deviation figure as the maximum deviation per se allowable. *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31, 89 S.Ct. 1225, 1228–29, 22 L.Ed.2d 519 (1969). Population variances among districts must be justified. *Id.*

That reluctance has fostered a wise constraint, as we can see by noting our advancing ability, in the last two decades, to perform mathematical manipulations by computer tools which can review in a short time great multitudes of variables which could not be examined by the machine-aided methods of the past within any feasible time period.

However, a plan is not per se unconstitutional just because a smaller population deviation could be achieved. *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983).

Consider the various maximum total deviations—at times on this record called the "maximum range of deviations"— which have been accepted or rejected during recent years. The Supreme Court has defined maximum total deviation as

the sum of the percentage by which ... [the] most populous district ... exceeds the ideal district population ... and the percentage by which ... the least populous ... [is] below this ideal.

*Board of Estimate v. Morris*, 489 U.S. 688, 700 n. 7, 109 S.Ct. 1433, 1441 n. 7, 103 L.Ed.2d 717 (1989).

In 1969, *Kirkpatrick* held that a 5.97% maximum deviation was bad. In 1973, *White v. Weiser* rejected a .284% maximum deviation (less than ³⁄₁₀ths of 1 percent) in favor of a .149% maximum deviation.

In 1982, the most recent *Pennsylvania Congressional District Reapportionment Case*, 567 F.Supp. 1507 (M.D.Pa. 1982), *aff'd without opinion, sub nom., Simon v. Davis*, 463 U.S. 1219, 103 S.Ct. 3564, 77 L.Ed.2d 1405 (1983), an opinion by Circuit Judge Weis, for a three-judge court, accepted a maximum deviation of .2354%, and, after further census revision, a maximum deviation of .399%, noting that the difference between those two figures—one-fourth of

one percent v. four-tenths of one percent—could be statistically insignificant, particularly when our constantly moving population necessarily means that a census count is simply the "snapshot" of a particular moment in time. 567 F.Supp. at 1515.

This present case has produced, in the Murtha–McDade Plan, the ultimate of equality with a maximum deviation of .0000017%, consisting of a difference of just one person out of 565,793. Departures from such mathematical perfection, according to the federal courts, are justified but only to advance the cause of equality realistically in the following respects:

—avoiding fragmentation of local government territories and splitting of election precincts, *Shayer v. Kirkpatrick,* 541 F.Supp. 922, 933 (1982), *aff'd sub nom., Schatzle v. Kirkpatrick,* 456 U.S. 966, 102 S.Ct. 2228, 72 L.Ed.2d 841 (1982);

—effectuating adequate representation of a minority community, *Shayer,* 541 F.Supp. at 930–31;

—creating districts which are compact and contiguous, *Carstens v. Lamm,* 543 F.Supp. 68, 82–88 (1982);

—maintaining relationships of shared community interests, *Carstens,* 543 F.Supp. at 82, 90–91; and

—not unduly departing from the useful familiarity of existing districts, *Dunnell v. Austin,* 344 F.Supp. 210 (1972).

All timely plans must be considered on the same footing, despite the Murtha–McDade Plans claim to be the only "bipartisan" one. It is, but, like all the plans, it is not disinterested, having been submitted on behalf of 11 incumbents.

## FACTUAL ANALYSIS

Direct and close comparison of the six competing plans is facilitated by Finding No. 16, which follows.

First, an explanation of the columns in Finding No. 16 is desirable.

*Column 1—Identification of Plan:* In addition to the record name for each plan, this column identifies the specific legislative bills, if any, which have substantially embodied the plan in the General Assembly. None of the listed bills was passed by both houses.

*Column 2—Maximum Deviation:* As defined above, this percentage figure is the sum of the percentage by which the most populous district exceeds the ideal equality number, plus the percentage by which the least populous district falls below that ideal number.

*Column 3—Average Deviation:* The mean figure which reflects an average of the percentage deviations for all 21 districts in the respective plan.

*Column 4—Split Municipalities:* Remembering that the term "municipality" includes counties, as well as cities, boroughs and townships in Pennsylvania, 1 Pa.C.S. § 1991, this column gives a count of the municipalities to which more than one of the proposed districts of the plan applies. This column treats Philadelphia as a county rather than a city.

*Column 5—Split Election Precincts:* Although a voting unit in Pennsylvania is officially termed an "election district," 25 P.S. § 2602(g), the table and the record here use, for the same concept, the term "precinct" in order to avoid confusion with the congressional "districts" which are the principal subject matter of this proceeding.

*Columns 6, 7—African–American Population of District 1:* These columns relate to the potentiality of a second congressional district with an African–American majority population, which would be in addition to Congressional District 2, which all plans recognize as presently being a majority African–American district in Philadelphia. Column 6 gives the African–American population percentage of the respective proposed district, and Column 7 gives the percentage of voting age African–American population in the proposed district.

*Column 8—Regional Communities of Interest:* This column indicates those plans which recognize the community-of-interest relationships established by the evidence (discussed below) as to (1) Lehigh Valley's long-standing joinder of Lehigh and Northampton Counties in one congressional district, (2) Berks and Schuylkill Counties' long-standing joinder in one congressional district, (3) keeping Bucks County in one congressional district, and (4) retention of Carlisle and adjacent municipalities such as North Middleton Township, in Cumberland County, within the 19th Congressional District.

*Column 9—Estimates of Party Balance of Seats:* Based solely on party registration statistics, this column gives the number of congressional seats thus projected for each party with respect to each plan across the state.

Because the criterion of compactness and contiguity involves visual inspection of a graphic presentation of the shape of a congressional district, that factor cannot be reflected by means of the tabulation in Finding No. 16, but must be considered separately.

The information tabulated in Finding No. 16 is drawn from Court Exhibit AA, comprised of listings of plan elements supplied by each party proposing a statewide plan, to confirm the stipulations of data which counsel entered into the record. Record Vol. 1: pp. 14–16, 20, 31, 61, 62, 76.

FINDING NO. 16

| PLAN BILL NO. PRNTR.# | MAXIMUM DEVIATION % | AVERAGE DEVIATION % | SPLIT MUNICIPAL UNITS | SPLIT ELECTION PRECINCTS | AFR-AMER POP. C.D. 1 | AFR-AMER V.A.P. C.D. 1 | REGIONAL INTERESTS (COUNTIES) | PARTY REGIS. BALANCE |
|---|---|---|---|---|---|---|---|---|
| PLNTFS.1 HB 541 #3024 | .1616% | .0393% | 16 COUNTIES 1 LOCAL | 1 | 52.4% | 49.7% | LEHIGH BERKS CUMB. | 10 D 11 R |
| PLNTFS.2 HB 541 #3024 | .0111% | .0024% | 19 COUNTIES 8 LOCAL | 3 | 52.4% | 49.7% | LEHIGH BERKS CUMB. | 10 D 11 R |
| O'DONN.A HB 2185 SB 205 | .0113% | .0026% | 23 COUNTIES 8 LOCAL | 0 | 39.2% | 36.1% | CUMB. | 10 D 11 R |
| O'DONN.B | .0083% | .0027% | 17 COUNTIES 8 LOCAL | 0 | 36.6% | 33.6% | | 11 D 10 R |
| LOEPER 1 HB 541 #3053 | .1334% | .0324% | 22 COUNTIES 10 LOCAL | 1 | 46.7% | 43.4% | LEHIGH | 11 D 10 R |
| Murtha-McDade | .0000% (1 person) | .0000% (less than one person) | 21 COUNTIES 27 LOCAL | 22 | 41.7% | 38.0% | CUMB. | 10 D 11 R |

In cases like the present, the judicial task has usually consisted of choosing one redistricting plan out of two or

more, as the plan conforming most closely to constitutional standards, e.g., *White v. Weiser, O'Sullivan v. Brier,* 540 F.Supp. 1200 (1982).

Unequipped to formulate a plan from scratch, the courts are also hard put to develop an ideal plan from a combination of several plans because that would be a feat similar to assembling a single completed jigsaw puzzle from the disparate pieces of several of them.

Moreover, if the courts adhere to a tradition of choosing one or the other of the plans proposed by the antagonists— like an arbitrator who confines approval to either the high demand of one side or the low offer of the other—then the challenge to develop mutually acceptable plans will be left in the legislature, where the job of political compromise belongs, rather than with the courts.

Therefore, the general question in this case is: Which of the half-dozen plans timely offered to this court comes closest to the constitutional standards in all pertinent respects?

### Districts Equal In Population To The Greatest Practicable Extent

The Murtha–McDade Plan (M–McD Exhs. 1–3) has achieved remarkable mathematical exactitude, with a maximum deviation of .0000017% and an average deviation of .0000009%.

However, the Murtha–McDade Plan falls below others precisely because the cost of achieving maximum mathematical equality lies in having the congressional district boundaries split 22 election precincts as well as 27 local governments.

Although 22 precincts constitute a small fraction of the 9,434 precincts in the state (R1:164), a serious election administration problem arises from requiring the voters in a single precinct to look to two different sets of congressional candidates. *Shayer.*

The problem is not a minor one. It arises from the fact that exactitude requires manipulation of the smallest census unit, the census block; Pennsylvania has 300,000 of them (R1:164) and their boundaries, based on visual limits useful to census taker functions, are not coterminous with the governmentally determined boundaries of the 9,435 election precincts.

Of course, redrawing official precinct boundaries to match the ideal congressional district is theoretically possible, but is not practical because each election precinct must serve many other different exercises of the franchise—for the election of legislators and council members, for example.

Nearest to the Murtha–McDade Plan in exactitude is the O'Donnell Plan B (O–B Exhs. 4–6), with a .0083% maximum deviation (R1:16), a .0027% average deviation (R1:20) and no split precincts.

Also close in equality of districts is Plaintiffs' Plan 2, with .0111% maximum deviation (R1:14), a .0024% average deviation, and with three split precincts, one of which affects no population.

The Loeper Plan, splitting just one precinct, has only a slighter higher deviation, at .1334% maximum and .0324% average.

The Murtha–McDade Plan proponents have questioned the validity of data adjustments made by the Legislative Data Processing Center and therefore affecting all of the other plans at issue, as drawn by legislative caucuses.

The Executive Director of the Legislative Data Processing Center described how the Center dealt with the problem which arises when a census block is split between two precincts or among more than two precincts (R1:162). This problem involves 2.6% (7,915) of the 300,000 census blocks in Pennsylvania; none of the census blocks are split across any municipal boundary.

Rather than arbitrarily assign a split census block entirely to one precinct or another, the Legislative Data Process-

ing Center, since 1980, has divided the census block population between the two precincts in proportion to the ratio of voting registrations in the two precincts.

The Murtha–McDade proponents' question is based on the contention that such an adjustment can be an invalidating factor because it departs from the official U.S. census figures. However, no authority for that proposition has been presented, and it is obvious that an arbitrary assignment of all of the population of a split census block to just one of the precincts would provide a result necessarily less accurate, and therefore less valid than the adjustment described.

Further evaluation of these plans, all of which are acceptable in terms of population equality, must ultimately depend upon other criteria. *Karcher.*

### *Racial Minority Empowerment Or Dilution*

Because the African–American population constitutes 9% of Pennsylvania's people, the formation of two Black majority districts is possible. When possible, an increase in the number of minority-in-the-majority districts is constitutionally required. *Thornburgh v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); *Jeffers v. Clinton,* 730 F.Supp. 196 (1989); *Hastert v. State Board of Elections,* 777 F.Supp. 634, 651 (1991).

Philadelphia, one of the three Pennsylvania counties large enough to embrace more than one congressional district, has a 39.85% African–American population (R1:38). Therefore, the various planners have looked to Philadelphia and to the City of Chester, the city in adjacent Delaware County which is the only Pennsylvania city with an African–American majority of citizens.

To date, the only African–American majority congressional district has been the Second District, currently at about 81% African–American population (R2A:54).

The key question is whether another Black majority congressional district can be mapped out of the adjoining First

District, by including in it Chester City and, necessarily, some small part of the present super-majority Second District.

Not surprisingly, the serious positions of the parties with special African–American concerns differ on this issue.

Supporters of the Hughes Plan for Philadelphia, represented by intervenor Harold James, would avoid reducing the Second District below 68% African–American population by raising the First District African–American population only to 47.18%, not a majority. Although that First District would also then have an ethnic Hispanic population of 10.71%, which is an acceptable consideration, *Campos v. City of Baytown, Texas,* 840 F.2d 1240 (5th Cir.1988), the result does not fully address the racial group goal by counting in a group which is an ethnic one in census terms. Moreover, aggregating two minority groups is allowable only if they are shown to be politically cohesive, *League of United Latin American Citizens v. Midland,* 648 F.Supp. 596 (1986), and there is no such proof on this record as to Hispanic and Black minorities.

There has been a contention that, to be a safe super-majority district, the Second District should not go below 69% or 68% African–American population. Congressman Blackwell, the incumbent of the Second District, permitted to intervene late in this case to submit a brief, contends that reduction below the present 81% African–American population would be a "dilution" of the minority representation effectiveness, but that term has normally been applied when the result is to fence minority groups into minority voting positions. *Carstens.*

Minority voting should be maximized as much as possible. *Jeffers v. Clinton.*

The Loeper Plan keeps the Second District at 68.055% African–American population but at the cost of achieving only 46.7% African–American population in the First District. The excluded Loeper Plan amendment, with 65.857% African–American population in the Second District still

would have had the First District just below a majority of African–American population, with 49.048%.

The Ryan Plan data in Court Exh. AA shows that, even if it had been timely filed so as to receive full consideration, it would not be acceptable because it did not create another Black majority district, in that its proposed First District would have been 47.5% African–American population.

Intervenors Philadelphia Leadership Conference, Frederick Douglas Society and Albert Swann urge the court to uphold the creation of a second African–American minority-in-majority district, namely the First District, while maintaining a substantial majority population of the minority group in the Second District.

The Plaintiffs' plans, both 1 and 2, would achieve that goal by getting the First District past the 50% barrier to 52.4% African–American population (R1:62), which would still leave the Second District at a healthy 62.242% African–American majority (R1:61), still entitled to be labeled as a strong majority, if not a "super" one.

The record here contains no evidence that 65% or 62% would risk minority group effectiveness (R3:21, 22). Indeed, a 60% minority group threshold has been held to be acceptable in this respect. *Martin v. Mabus*, 700 F.Supp. 327 (S.D.Miss.1988).

The O'Donnell Plan A, on the other hand, proposes only 39.2% in the First District and the O'Donnell Plan B only 36.6% in the First District. The Murtha–McDade Plan also does not achieve a Black majority in the First District, with a 41.7% African–American population figure.

The hearings in this case have investigated this matter from all aspects, even pointing out that many African–American voters which would be added to the First District from Chester City may be registered Republican, not Democratic. Of course, that is not a startling revelation. No court can accept any false stereotypical belief that Black voters have a monolithic position. Indeed, the variety of views in this case disprove any such idea.

On the basis of deviations from equality minimized as much as possible, with a lessened administrative problem as a result of minimal precinct splitting, and embodiment of a potential for two African–American majority districts, our scrutiny now must focus on Plaintiff Plan 2 as the leading prospect for approval. Examination of that plan in relation to the salient regional concerns, as voiced in this record, must come next.

## *Regional Concerns*

Various intervenors have raised community-of-interest issues with respect to five regions of the state. Evidence of a community of interest among neighboring areas in those regions has been clear and undisputed.

### Cheltenham Township, Montgomery County

By brief amicus curiae, Cheltenham Township in Montgomery County has reflected a desire to keep the entire township in the Thirteenth Congressional District.

(17) That is proposed by Plaintiffs' Plans 1 and 2, by the Loeper Plan and by the O'Donnell Plans A and B. However, the Murtha–McDade Plan describes only 73 persons out of Cheltenham's population of 34,923 as being in the Thirteenth Congressional District, thus placing the bulk of Cheltenham elsewhere.

### Lehigh Valley, Lehigh and Northampton Counties

(18) Undisputed testimony by Intervenors Freeman, Ritter and McHale establish that Lehigh and Northampton Counties, with aggregate population close to the ideal district population, have been together within the Fifteenth Congressional District since 1972.

(19) The valley itself, its circulation arteries, its common news media, and its organizational and cultural ties have a unifying influence on this Lehigh Valley Area. (R3:154–190).

(20) None of the statewide plans precisely include all of the area preferred by the Lehigh Valley advocates, who would also include a portion of Berks County. The two

counties of Lehigh and Northampton are joined by Plaintiffs' Plans 1 and 2, and by the Loeper Plan. The O'Donnell Plans A and B and the Murtha–McDade Plan do not embrace all of the two counties in a proposed congressional district.

### Berks and Schuylkill Counties

(21) The evidence presented by Intervenor Brightbill establishes that the Berks and Schuylkill Counties share a community of interest in a common economic base, in circulation arteries, and in schools of higher education as well as other matters. (R3:190–198)

(22) The relationship of these two entire counties is maintained in Plaintiffs' Plans 1 and 2 but not in the O'Donnell A or B Plans, the Loeper Plan or in the Murtha–McDade Plan.

### Cumberland County

(23) Evidence on behalf of Intervenor Jarvis supports the affinity of Carlisle and North Middleton Township, in Cumberland County, with other communities in the Nineteenth Congressional District, rather than in the Ninth.

(24) Plaintiffs' Plans 1 and 2, O'Donnell Plan A and the Murtha–McDade Plan maintain that relationship. The O'Donnell Plan B and the Loeper Plan do not do so.

### Summary

(25) The Plaintiffs' Plans 1 and 2 are the only plans which substantially satisfy all of the regional concerns.

### *Allegheny County*

However, the Plaintiffs' Plans 1 and 2 encounter a challenge in their proposed disposition of Congressional Districts Fourteen and Eighteen in Allegheny County and in areas surrounding it, a portion of the state where the most substantial population decline has occurred over the previous decade.

Because of the anticipated retirement of Congressman Gaydos in the Twentieth Congressional District, the reposi-

tioning of a portion of that district has loomed large in reducing the number of Pennsylvania districts from 23 to 21. Accusations of partisanship have been directed by various parties at each other.

The issue requires graphic illustration. On the following two pages are shown proposals for Pittsburgh and Allegheny County. The first map following is that proposed by Plaintiffs' Plan 2. The second map following is the same area as it appears in Plaintiffs' Plan 3, the plan which the plaintiffs withdrew during the hearings.

PLAINTIFFS' PLAN 2

PLAINTIFFS' PLAN 3

COUNTY LINE DISTRICT LINES

(26) The City of Pittsburgh has been, and is proposed by all to remain entirely within the Fourteenth Congressional District.

(27) The City of Pittsburgh is surrounded by suburbs on all sides, with suburbs in the North Hills, in Sewickley Valley (in the northwest), and in Chartiers Valley, all having some community of interest. (R2B:108–110)

(28) The city has more in common with the close-in easterly suburbs and in the Monongahela Valley's former steel-making areas than with the suburbs in the north, west and south.

Plaintiffs' Plan 3 (the second map) appears to recognize those community-of-interest factors by extending the Fourteenth District into the westerly side of the Monongahela Valley and encircling the Fourteenth District with the Eighteenth to embrace the northerly, westerly and southerly suburbs.

The result, however, is to create an Eighteenth Congressional District which in shape is almost a hollow circle with an open arc at the bottom. The present Eighteenth Congressional District also embraces the city on the north, west and south but, not quite in a configuration approximating a circle.

The configuration in Plaintiffs' Plan 2, on the first map, is visually more compact, with the Fourteenth District covering the city and part of the suburbs north and northwest of the city, while the Eighteenth District is proposed to embrace the northeasterly suburbs, the easternmost suburbs and municipalities on both sides of the Monongahela River, plus an arm extending westward to some of the suburbs due south of the city.

Neither of these proposals are models of compactness or contiguity, but in that respect, the Plaintiffs' Plans are not alone. The Loeper Plan proposes a result similar to Plaintiffs' Plan 3, and the Murtha–McDade Plan would treat the Fourteenth District in some respects similar to Plaintiffs' Plan 3 by extending that district into the northerly suburbs.

Again, when the courts are thrust into this role, with no feasible option except to take one entire plan or the other, applying the more objective criteria of compactness and contiguity indicates acceptance of Plaintiffs' Plan 2 on that basis, as a less satisfying aspect of a plan otherwise meritorious.

## CONCLUSION

The resulting recommendation, considering all of the elements reviewed above, is to advise in favor of approval of Plaintiffs' Plan 2 as (1) having a low maximum deviation, (2) consistent with minimal splitting of precincts, (3) achieving an enlarged number of two congressional districts with a majority African–American population and (4) coming closest to implementing the community-of-interest factors in those regions across the state which have identified them.

## REVISED ELECTION CALENDAR RECOMMENDATIONS

Reference is made to Memorandum of Respondents, filed on behalf of the Secretary of the Commonwealth and the Election Commissioner, to recommend suggested revisions in the election calendar resulting from this litigation (and also from the separate case involving appeals to the Supreme Court from the Reapportionment Commission).

Noted and recommended for adoption by the Supreme Court is the Secretary's recommendation that the calendar for electing delegates and alternate delegates to the national conventions be revised along with the congressional election calendar because of their related nature.

All of the proposals of the Secretary are hereby recommended for consideration by the Supreme Court, with the exception of the proposed dates for the Commonwealth Court's latest hearing and deadline for filing that court's decisions on objections to nominating petitions.

The Election Code limitation for judicial review of such objections, 25 P.S. § 2937, has been held to be directory, not mandatory. *In re Moore,* 447 Pa. 526, 291 A.2d 531 (1972).

The development of objections to nominating petitions, usually involving scrutiny of numerous signatures, is time consuming. Nevertheless, Commonwealth Court, following a Friday, March 13 deadline for filing nominating petitions, would propose to convene hearings on objections promptly

on Monday, March 16, *before* the proposed March 19 deadline for filing such objections.

With Thursday, March 19, as the last day for filing objections, as the Secretary recommends, Commonwealth Court should also have the week of March 23–27 to conclude all hearings. And the latest day for the filing of the court's decisions, pursuant to those hearings, could be the following Monday, March 30.

Hence, the period from April 1 through April 28 would remain for the important administrative aspects of the election process to proceed.

Of course, if nominating petition objection cases could possibly be concluded sooner than the recommended dates, the Commonwealth Court, being experienced in such litigation, would certainly strive to do so.

Accordingly, a recommended revised election calendar for Congress and delegates to national conventions is appended hereto as Appendix B.

The Secretary has also recommended a revised schedule for elections for Senator and Representative in the General Assembly, appended hereto as Appendix C.

Although that election schedule is not involved in this case, coordination of the congressional election schedule with it would be desirable.

For Commonwealth Court review of objections to nominating petitions for state legislative offices, there is recommended the same period, with hearings to be concluded not later than March 27 and decisions to be filed not later than Monday, March 30. The last such decision probably could be filed substantially sooner because of the earlier March 6 deadline which the Supreme Court has set for filing nominating petitions for legislative office.

## FORM OF ORDER

A proposed form of order follows.

Respectfully submitted,
/s/ David W. Craig
DAVID W. CRAIG,
President Judge

## RECOMMENDED FORM OF ORDER

NOW, , 1992, pursuant to hearing held upon complaint, it is hereby ORDERED as follows:

1. Section 1801–A of the Election Code, Act of June 3, 1937, P.L. 1333, added March 3, 1982, P.L. 127, § 2, 25 P.S. § 3571, is hereby declared unconstitutional and its implementation for the purpose of conducting elections to the office of Representative in the United States Congress is hereby permanently enjoined.

2. Such elections, in the primary and general elections in the years 1992, 1994, 1996, 1998 and 2000 shall be conducted in accordance with the Congressional Election Districts described in Appendix A, attached to and hereby made part of this Order, and hereby adopted as the apportionment of the Commonwealth into twenty-one (21) Congressional Districts until the same shall be lawfully changed.

3. The schedule for the primary elections to be held April 28, 1992, for the election of Representatives to the United States Congress and for Delegates and Alternate Delegates to National Conventions, shall be conducted by the Secretary of the Commonwealth and by all election officers within the Commonwealth in accordance with the Revised Election Calendar attached to this Order as Appendix B, and hereby made part hereof, to provide for an orderly election process.

4. In addition, the Secretary of the Commonwealth shall, as soon as possible, publish in the Pennsylvania Bulletin and through news media, by description and, if feasible, by maps, the Congressional Districts hereby adopted in Appendix A.

5. The members of Congress now in office shall continue in the office until expiration of their respective terms.

6. Vacancies now existing or happening after the entry of this Order and before the commencement of the terms of the members elected at the election of 1992 shall be filled for the unexpired terms from the districts formerly prescribed in Section 1801–A of the Election Code, Act of June 3, 1937, P.L. 1333, added March 3, 1982, P.L. 127, § 2, 25 P.S. § 3571.

7. In the event any municipality or part thereof should be omitted in the description of congressional districts in Appendix A, the municipality or part thereof shall be included as a part of the congressional district which completely surrounds it. Should any omitted municipality or part thereof be not completely surrounded by one congressional district, it shall become a part of that congressional district to which it is contiguous, or if there are two or more such contiguous districts, it shall become a part of that congressional district contiguous thereto which has the least population.

APPENDIX A TO OPINION OF PRESIDENT JUDGE CRAIG
PLAINTIFFS PROPOSED CONGRESSIONAL PLAN 2
LEGISLATIVE DATA PROCESSING CENTER
COMPOSITE LISTING
OF
CONGRESSIONAL DISTRICTS

| DISTRICT NUMBER | DESCRIPTION |
| --- | --- |
| Dist. 01 | DELAWARE and PHILADELPHIA Counties. Part of DELAWARE County consisting of the CITY of Chester (Excluding Blocks 201, 207, 208 of 1990 Census Tract 4046) and the TOWNSHIPS of Darby, Ridley (Blocks 903 and 919 of 1990 Census Tract 4041.03) and Tinicum and the BOROUGHS of Colwyn, Eddystone, Folcroft and Glenolden and Part of PHILADELPHIA County consisting of the CITY of Philadelphia (PART, Wards 01, 02 [PART, Divisions 01, 02, 03, 04, 05, 06, 07, 08, 09, 10, 11, 12, 13, 14, 15, 16, 17, 18, |

86

19, 20, 21, 22, 23 and 26], 05 [PART, Divisions 02, 03, 06, 07, 08, 09, 10, 11, 12, 13, 14, 15, 17, 20, 22 and 23], 07, 10, 11, 12, 13, 14, 16, 17, 19, 20, 26, 30, 32, 36 [PART, Divisions 29, 35 and 37], 37, 39, 40, 43, 47, 48 [PART, Divisions 01, 08, 12, 13, 14, 15 and 17] and 49).
Total population: 565,802

Dist. 02
DELAWARE and PHILADELPHIA Counties.
Part of DELAWARE County consisting of the BOROUGHS of Darby, Lansdowne and Yeadon and Part of PHILADELPHIA County consisting of the CITY of Philadelphia (PART, Wards 03, 04, 06, 08, 09, 15, 21, 22, 24, 27, 28, 29, 34, 36 [PART, Divisions 01, 02, 03, 04, 05, 06, 07, 08, 09, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 30, 31, 32, 33, 34, 36, 38, 39, 40 and 41], 38, 44, 46, 48 [PART, Divisions 02, 03, 04, 05, 06, 07, 09, 10, 11, 16, 18, 19, 20, 21, 22 and 23], 50, 51, 52, 59 and 60).
Total population: 565,815

Dist. 03
PHILADELPHIA County.
Part of PHILADELPHIA County consisting of the CITY of Philadelphia (PART, Wards 02 [PART, Divisions 24, 25 and 27], 05 [PART, Divisions 01, 04, 05, 16, 18, 19 and 21], 18, 23, 25, 31, 33, 35, 41, 42, 45, 53, 54, 55, 56, 57, 58, 61, 62, 63, 64, 65 and 66).
Total population: 565,775

Dist. 04
ALLEGHENY, BEAVER, BUTLER, LAWRENCE and WESTMORELAND Counties.
Part of ALLEGHENY County consisting of the TOWNSHIPS of East Deer, Fawn, Frazer, Harrison, Marshall, Pine, Richland and West Deer and the BOROUGHS of Brackenridge, Bradford Woods, Cheswick, Plum and Tarentum; All of BEAVER County; Part of BUTLER County consisting of the TOWNSHIPS of Adams, Buffalo, Clinton, Cranberry, Jackson and Middlesex and the BOROUGHS of Harmony, Mars, Saxonburg, Seven Fields, Valencia and Zelienople; All of LAWRENCE County

and Part of WESTMORELAND County consisting of the CITIES of Arnold, Jeannette, Lower Burrell and New Kensington and the TOWNSHIPS of Allegheny, North Huntingdon, Penn, Salem, Upper Burrell and Washington and the BOROUGHS of Delmont, East Vandergrift, Export, Hyde Park, Irwin, Manor, Murrysville, North Irwin, Penn, Trafford (Westmoreland County Portion) and Vandergrift.

Total population: 565,792

Dist. 05 ARMSTRONG, CAMERON, CENTRE, CLARION, CLEARFIELD, CLINTON, CRAWFORD, ELK, FOREST, JEFFERSON, LYCOMING, MCKEAN, POTTER, TIOGA, UNION, VENANGO and WARREN Counties.

Part of ARMSTRONG County consisting of the TOWNSHIP of Madison; All of CAMERON County; Part of CENTRE County consisting of the TOWNSHIPS of Benner, Boggs, College, Curtin, Ferguson, Gregg, Haines, Harris, Howard, Huston, Liberty, Marion, Miles, Patton, Penn, Potter, Spring and Walker and the BOROUGHS of Bellefonte, Centre Hall, Howard, Milesburg, Millheim and State College; Part of CLARION County consisting of the TOWNSHIPS of Ashland, Beaver, Brady, Clarion, Elk, Farmington, Highland, Knox, Licking, Limestone, Madison, Millcreek, Monroe, Paint, Perry, Piney, Porter, Red Bank, Richland, Salem, Toby and Washington and the BOROUGHS of Callensburg, Clarion, East Brady, Foxburg, Hawthorn, Knox, Rimersburg, Shippenville, Sligo, St. Petersburg and Strattanville; Part of CLEARFIELD County consisting of the township of Falls Creek; All of CLINTON County, Part of CRAWFORD County consisting of the CITY of Titusville and the TOWNSHIPS of Athens, Bloomfield, East Mead, Oil Creek, Randolph, Rome, Sparta, Steuben, Troy and Wayne and the BOROUGHS of Centerville, Cochranton, Hydetown, Spartansburg and Townville; All of ELK County; All of FOREST County; All of JEFFERSON County; Part

88

of LYCOMING County consisting of the TOWNSHIPS of Anthony, Bastress, Brown, Cogan House, Cummings, Limestone, McHenry, Mifflin, Nippenose, Piatt, Pine, Porter, Susquehanna, Washington and Watson and the BOROUGHS of Jersey Shore and Salladasburg; All of MCKEAN County; All of POTTER County; All of TIOGA County; All of UNION County; All of VENANGO County and All of WARREN County.
Total population: 565,813

Dist. 06 BERKS, MONTGOMERY, NORTHUMBERLAND and SCHUYLKILL Counties.
All of BERKS County; Part of MONTGOMERY County consisting of the TOWNSHIPS of Upper Pottsgrove and West Pottsgrove and the BOROUGH of Pottstown (PART, Districts 01, 02, 03, 04, 05 and 07); Part of NORTHUMBERLAND County consisting of the CITY of Sunbury and the TOWNSHIPS of Delaware, East Chillisquaque, Jackson, Jordan, Little Mahanoy, Lower Augusta, Lower Mahanoy, Point, Rockefeller, Turbot, Upper Augusta, Upper Mahanoy and West Chillisquaque and the BOROUGHS of Herndon, Mc Ewensville, Milton, Northumberland, Riverside, Snydertown and Watsontown and All of SCHUYLKILL County.
Total population: 565,786

Dist. 07 CHESTER, DELAWARE and MONTGOMERY Counties.
Part of CHESTER County consisting of the TOWNSHIPS of Charlestown, East Pikeland, East Whiteland, Easttown, Schuylkill, Tredyffrin, West Pikeland, West Vincent and Willistown and the BOROUGHS of Malvern, Phoenixville and Spring City; Part of DELAWARE County consisting of the CITY of Chester (Blocks 201, 207, 208 of 1990 Census Tract 4046) and the TOWNSHIPS of Aston, Bethel, Birmingham, Chester, Concord, Edgemont, Haverford, Lower Chichester, Marple, Middletown, Nether Providence, Newtown, Radnor, Ridley (Ex-

cluding Blocks 903 and 919 of 1990 Census Tract 4041.03), Springfield, Thornbury, Upper Chichester, Upper Darby and Upper Providence and the BOROUGHS of Aldan, Brookhaven, Chester Heights, Clifton Heights, Collingdale, East Lansdowne, Marcus Hook, Media, Millbourne, Morton, Norwood, Parkside, Prospect Park, Ridley Park, Rose Valley, Rutledge, Sharon Hill, Swarthmore, Trainer and Upland and Part of MONTGOMERY County consisting of the TOWNSHIP of Upper Merion (Excluding Block 213 of 1990 Census Tract 2059.04) and the BOROUGHS of Bridgeport and Royersford.
Total population: 565,754

Dist. 08

BUCKS and MONTGOMERY Counties.
All of BUCKS County and Part of MONTGOMERY County consisting of the TOWNSHIPS of Horsham and Lower Moreland (PART, District 04).
Total population: 565,787

Dist. 09

BEDFORD, BLAIR, CENTRE, CLEARFIELD, FRANKLIN, FULTON, HUNTINGDON, JUNIATA, MIFFLIN, PERRY and SNYDER Counties.
All of BEDFORD County; All of BLAIR County; Part of CENTRE County consisting of the TOWNSHIPS of Burnside, Halfmoon, Rush, Snow Shoe, Taylor, Union and Worth and the BOROUGHS of Philipsburg, Port Matilda, Snow Shoe, South Philipsburg and Unionville; All of CLEARFIELD County except the TOWNSHIP of Falls Creek; All of FRANKLIN County All of FULTON County; All of HUNTINGDON County; All of JUNIATA County; All of MIFFLIN County; Part of PERRY County consisting of the TOWNSHIPS of Centre, Jackson, North East Madison, Saville, South West Madison, Spring, Toboyne, Tuscarora and Tyrone and the BOROUGHS of Blain, Bloomfield and Landisburg and All of SNYDER County.
Total population: 565,803

90

Dist. 10 BRADFORD, LACKAWANNA, LYCOM-
ING, MONROE, PIKE, SULLIVAN, SUS-
QUEHANNA, WAYNE and WYOMING
Counties.
All of BRADFORD County; All of LACKA-
WANNA County; Part of LYCOMING
County consisting of the CITY of Williams-
port and the TOWNSHIPS of Armstrong,
Brady, Cascade, Clinton, Eldred, Fairfield,
Franklin, Gamble, Hepburn, Jackson, Jor-
dan, Lewis, Loyalsock, Lycoming, Mc In-
tyre, Mc Nett, Mill Creek, Moreland, Muncy,
Muncy Creek, Old Lycoming, Penn, Plunk-
etts Creek, Shrewsbury, Upper Fairfield,
Wolf and Woodward and the BOROUGHS
of Duboistown, Hughesville, Montgomery,
Montoursville, Muncy, Picture Rocks and
South Williamsport; Part of MONROE
County consisting of the TOWNSHIPS of
Barrett, Coolbaugh, Jackson, Middle Smith-
field, Paradise, Pocono, Price and Smithfield
and the BOROUGHS of Delaware Water
Gap, East Stroudsburg (PART, Districts 02
and 03) and Mt. Pocono; All of PIKE Coun-
ty; All of SULLIVAN County; All of SUS-
QUEHANNA County; All of WAYNE
County and All of WYOMING County.
Total population: 565,796

Dist. 11 CARBON, COLUMBIA, LUZERNE, MON-
ROE, MONTOUR and NORTHUMBER-
LAND Counties.
All of CARBON County; All of COLUMBIA
County; All of LUZERNE County; Part of
MONROE County consisting of the TOWN-
SHIPS of Chestnuthill, Eldred, Hamilton,
Polk, Ross, Stroud, Tobyhanna and Tunk-
hannock and the BOROUGHS of East
Stroudsburg (PART, Districts 01, 04, 05 and
06) and Stroudsburg; All of MONTOUR
County and Part of NORTHUMBERLAND
County consisting of the CITY of Shamokin
and the TOWNSHIPS of Coal, East Camer-
on, Lewis, Mt. Carmel, Ralpho, Rush, Sha-
mokin, Washington, West Cameron and
Zerbe and the BOROUGHS of Kulpmont,
Marion Heights, Mt. Carmel and Turbotville.
Total population: 565,798

| | |
|---|---|
| Dist. 12 | ARMSTRONG, CAMBRIA, CLARION, FAYETTE, INDIANA, SOMERSET and WESTMORELAND Counties. Part of ARMSTRONG County consisting of the TOWNSHIPS of Bethel, Boggs, Bradys Bend, Burrell, Cadogan, Cowanshannock, East Franklin, Gilpin, Hovey, Kiskiminetas, Kittanning, Mahoning, Manor, North Buffalo, Parks, Perry, Pine, Plumcreek, Rayburn, Redbank, South Bend, South Buffalo, Sugarcreek, Valley, Washington, Wayne and West Franklin and the BOROUGHS of Apollo, Applewold, Atwood, Dayton, Elderton, Ford City, Ford Cliff, Freeport, Kittanning, Leechburg, Manorville, North Apollo, Parker City, Rural Valley, South Bethlehem, West Kittanning and Worthington; All of CAMBRIA County; Part of CLARION County consisting of the BOROUGH of New Bethlehem; Part of FAYETTE County consisting of the CITY of Connellsville and the TOWNSHIPS of Connellsville, Dunbar, Georges, Henry Clay, North Union, Springfield, Stewart and Wharton and the BOROUGHS of Dunbar, Fairchance, Markleysburg, Ohiopyle, Smithfield, South Connellsville and Vanderbilt; All of INDIANA County; All of SOMERSET County and Part of WESTMORELAND County consisting of the TOWNSHIPS of Bell, Cook, Derry, Donegal, East Huntingdon, Fairfield, Ligonier, Loyalhanna, Mt. Pleasant, St. Clair and Unity and the BOROUGHS of Avonmore, Bolivar, Derry, Donegal, Latrobe, Laurel Mountain, Ligonier, Mt. Pleasant, New Alexandria, New Florence, Oklahoma, Scottdale, Seward, West Leechburg and Youngstown. Total population: 565,794 |
| Dist. 13 | MONTGOMERY County. Part of MONTGOMERY County consisting of the TOWNSHIPS of Abington, Cheltenham, East Norriton, Franconia, Hatfield, Limerick, Lower Frederick, Lower Gwynedd, Lower Merion, Lower Moreland (PART, Districts 01, 02, 03, 05 and 06), Lower Pottsgrove, Lower Providence, Lower Salford, |

Marlborough, Montgomery, Perkiomen, Plymouth, Salford, Skippack, Springfield, Towamencin, Upper Dublin, Upper Gwynedd, Upper Merion (Block 213 of 1990 Census Tract 2059.04), Upper Moreland, Upper Providence, Upper Salford, West Norriton, Whitemarsh, Whitpain and Worcester and the BOROUGHS of Ambler, Bryn Athyn, Collegeville, Conshohocken, Hatboro, Hatfield, Jenkintown, Lansdale, Narberth, Norristown, North Wales, Pottstown (PART, District 06), Rockledge, Schwenksville, Souderton, Telford (Montgomery County Portion), Trappe and West Conshohocken. Total population: 565,767

Dist. 14

ALLEGHENY County.
Part of ALLEGHENY County consisting of the CITY of Pittsburgh and the TOWNSHIPS of Aleppo, Collier, Hampton, Kennedy, Kilbuck, Leet, Mc Candless, Neville, Ohio, Robinson, Ross and Stowe and the BOROUGHS of Avalon, Bell Acres, Bellevue, Ben Avon, Ben Avon Heights, Crafton, Edgewood, Emsworth, Franklin Park, Green Tree, Homestead, Ingram, Leetsdale, Mc Kees Rocks, Mt. Oliver, Pennsbury Village, Rosslyn Farms, Sewickley Heights, Sewickley Hills, Thornburg and West View. Total population: 565,787

Dist. 15

LEHIGH, MONTGOMERY and NORTHAMPTON Counties.
All of LEHIGH County; Part of MONTGOMERY County consisting of the TOWNSHIPS of Douglass, New Hanover, Upper Frederick and Upper Hanover and the BOROUGHS of East Greenville, Green Lane, Pennsburg and Red Hill and All of NORTHAMPTON County. Total population: 565,810

Dist. 16

CHESTER and LANCASTER Counties.
Part of CHESTER County consisting of the CITY of Coatesville and the TOWNSHIPS of Birmingham, Caln, East Bradford, East Brandywine, East Caln, East Coventry, East Fallowfield, East Goshen, East Marlbor-

ough, East Nantmeal, East Nottingham, East Vincent, Elk, Franklin, Highland, Honeybrook, Kennett, London Britain, London Grove, Londonderry, Lower Oxford, New Garden, New London, Newlin, North Coventry, Penn, Pennsbury, Pocopson, Sadsbury, South Coventry, Thornbury, Upper Oxford, Upper Uwchlan, Uwchlan, Valley, Wallace, Warwick, West Bradford, West Brandywine, West Caln, West Fallowfield, West Goshen, West Marlborough, West Nantmeal, West Nottingham, West Sadsbury, West Whiteland and Westtown and the BOROUGHS of Atglen, Avondale, Downingtown, Elverson, Honey Brook, Kennett Square, Modena, Oxford, Parkesburg, South Coatesville, West Chester and West Grove and Part of LANCASTER County consisting of the CITY of Lancaster and the TOWNSHIPS of Bart, Brecknock, Caernarvon, Colerain, Drumore, Earl, East Cocalico, East Drumore, East Earl, East Hempfield (PART, Districts

| | | | |
|---|---|---|---|
| Barrcrest | (1990), | Centerville | (1990), |
| Cherry Hill | (1990), | Chestnut Ridge | (1990), |
| Friendly | (1990), | Golden Acres | (1990), |
| Kings | (1990), | Landisville | (1990), |
| Petersburg | (1990), | Pleasant View | (1990) and |
| Rohrerstown | (1990)), | | |

East Lampeter, Eden, Fulton, Lancaster, Leacock, Little Britain, Manheim, Martic, Paradise, Pequea, Providence, Sadsbury, Salisbury, Strasburg, Upper Leacock, Warwick, West Cocalico, West Earl and West Lampeter and the BOROUGHS of Adamstown (Lancaster County Portion), Christiana, Denver, East Petersburg, Lititz, Millersville, New Holland, Quarryville, Strasburg and Terre Hill.
Total population: 565,804

Dist. 17 CUMBERLAND, DAUPHIN, LANCASTER, LEBANON and PERRY Counties. Part of CUMBERLAND County consisting of the TOWNSHIPS of East Pennsboro, Hampden (PART, Precincts 02a, 02b, 03, 04 and 05) and Silver Spring and the BOROUGHS of Mechanicsburg and Shiremanstown; All of DAUPHIN County; Part of LANCASTER County consisting of the TOWNSHIPS of Clay, Conestoga, Conoy,

East Donegal, East Hempfield (PART, Districts

| Hempland | (1990), | Indian Springs | (1990), |
|----------|---------|----------------|---------|
| Millcreek | (1990) | and Scotland | (1990)), |

Elizabeth, Ephrata, Manor, Mt. Joy, Penn, Rapho, West Donegal and West Hempfield and the BOROUGHS of Akron, Columbia, Elizabethtown, Ephrata, Manheim, Marietta, Mountville and Mt. Joy; All of LEBANON County and Part of PERRY County consisting of the TOWNSHIPS of Buffalo, Carroll, Greenwood, Howe, Juniata, Liverpool, Miller, Oliver, Penn, Rye, Watts and Wheatfield and the BOROUGHS of Duncannon, Liverpool, Marysville, Millerstown, New Buffalo and Newport.
Total population: 565,817

Dist. 18 ALLEGHENY County.
Part of ALLEGHENY County consisting of the CITIES of Clairton, Duquesne and Mc Keesport and the TOWNSHIPS of Baldwin, Elizabeth, Forward, Harmar, Indiana, Mt. Lebanon, North Versailles, O Hara, Penn Hills, Reserve, Scott, Shaler, South Park, South Versailles, Springdale and Wilkins and the BOROUGHS of Aspinwall, Baldwin, Blawnox, Braddock, Braddock Hills, Brentwood, Carnegie, Castle Shannon, Chalfant, Churchill, Dormont, Dravosburg, East McKeesport, East Pittsburgh, Elizabeth, Etna, Forest Hills, Fox Chapel, Glassport, Heidelberg, Jefferson, Liberty, Lincoln, Millvale, Monroeville, Munhall, North Braddock, Oakmont, Pitcairn, Pleasant Hills, Port Vue, Rankin, Sharpsburg, Springdale, Swissvale, Trafford (Allegheny County Portion), Turtle Creek, Verona, Versailles, Wall, West Elizabeth, West Homestead, West Mifflin, Whitaker, White Oak, Whitehall, Wilkinsburg and Wilmerding.
Total population: 565,781

Dist. 19 ADAMS, CUMBERLAND and YORK Counties.
All of ADAMS County; Part of CUMBERLAND County consisting of the TOWNSHIPS of Cooke, Dickinson, Hampden (PART, Precincts 01 North and 01 South),

Hopewell, Lower Allen, Lower Frankford, Lower Mifflin, Middlesex, Monroe, North Middleton, North Newton, Penn, Shippensburg, South Middleton, South Newton, Southampton, Upper Allen, Upper Frankford, Upper Mifflin and West Pennsboro and the BOROUGHS of Camp Hill, Carlisle, Lemoyne, Mt. Holly Springs, New Cumberland, Newburg, Newville, Shippensburg (Cumberland County Portion), West Fairview and Wormleysburg and All of YORK County.
Total population: 565,779

Dist. 20 ALLEGHENY, FAYETTE, GREENE, WASHINGTON and WESTMORELAND Counties.
Part of ALLEGHENY County consisting of the TOWNSHIPS of Crescent, Findlay, Moon, North Fayette, South Fayette and Upper St. Clair and the BOROUGHS of Bethel Park, Bridgeville, Coraopolis, Edgeworth, Glenfield, Haysville, McDonald (Allegheny County Portion), Oakdale, Osborne and Sewickley; Part of FAYETTE County consisting of the CITY of Uniontown and the TOWNSHIPS of Brownsville, Bullskin, Franklin, German, Jefferson, Lower Tyrone, Luzerne, Menallen, Nicholson, Perry, Redstone, Saltlick, South Union, Springhill, Upper Tyrone and Washington and the BOROUGHS of Belle Vernon, Brownsville, Dawson, Everson, Fayette City, Masontown, Newell, Perryopolis and Point Marion; All of GREENE County; All of WASHINGTON County and Part of WESTMORELAND County consisting of the CITIES of Greensburg and Monessen and the TOWNSHIPS of Hempfield, Rostraver, Sewickley and South Huntingdon and the BOROUGHS of Adamsburg, Arona, Hunker, Madison, New Stanton, North Belle Vernon, Smithton, South Greensburg, Southwest Greensburg, Sutersville, West Newton and Youngwood.
Total population: 565,815

Dist. 21 BUTLER, CRAWFORD, ERIE and MERCER Counties.

Part of BUTLER County consisting of the CITY of Butler and the TOWNSHIPS of Allegheny, Brady, Butler, Center, Cherry, Clay, Clearfield, Concord, Connoquenessing, Donegal, Fairview, Forward, Franklin, Jefferson, Lancaster, Marion, Mercer, Muddycreek, Oakland, Parker, Penn, Slippery Rock, Summit, Venango, Washington, Winfield and Worth and the BOROUGHS of Bruin, Callery, Cherry Valley, Chicora, Connoquenessing, East Butler, Eau Claire, Evans City, Fairview, Harrisville, Karns City, Petrolia, Portersville, Prospect, Slippery Rock, West Liberty and West Sunbury; Part of CRAWFORD County consisting of the CITY of Meadville and the TOWNSHIPS of Beaver, Cambridge, Conneaut, Cussewago, East Fairfield, East Fallowfield, Fairfield, Greenwood, Hayfield, North Shenango, Pine, Richmond, Rockdale, Sadsbury, South Shenango, Spring, Summerhill, Summit, Union, Venango, Vernon, West Fallowfield, West Mead, West Shenango and Woodcock and the BOROUGHS of Blooming Valley, Cambridge Springs, Conneaut Lake, Conneautville, Linesville, Saegertown, Springboro, Venango and Woodcock; All of ERIE County and All of MERCER County. Total population: 565,802

Population of all districts: 11,881,643

## APPENDIX B TO OPINION OF PRESIDENT JUDGE CRAIG
### PROPOSED REVISED ELECTION CALENDAR FOR REPRESENTATIVE IN UNITED STATES CONGRESS AND DELEGATE AND ALTERNATE DELEGATE TO NATIONAL CONVENTIONS

Date of Supreme Court's Final Order in *Mellow v. Mitchell,* No. 7 M.D.Misc.Dkt.1992

First legal day to circulate and file nomination petitions

Within 24 hours after date of Supreme Court's final order

Secretary of the Commonwealth will send to the county boards of elections a written notice announcing that candidates are to be nominated at the April 28, 1992 primary for

the office of Representative in Congress

Within 24 hours after date that political parties have filed their apportionment of delegates and alternate delegates among the congressional districts — Secretary of the Commonwealth will send to the county boards of elections a written notice announcing that candidates are to be elected at the April 28, 1992 primary for the party offices of Delegate and Alternate Delegate to the National conventions of the political parties and designating the number of such offices to be elected in each congressional district

No later than 7 days after Supreme Court's Final Order in *Mellow* — The county boards of elections will publish a notice in newspapers that nominations of candidates for Representative in Congress will be made and that elections of persons to the party offices of Delegate and Alternate Delegate to National conventions of the political parties will occur at the April 28, 1992 General Primary, such notice to specify that the Court has established a deadline of March 13, 1992 by which nomination petitions for such offices must be filed

March 13 — Last day to circulate and file nomination petitions

March 14 — First legal day to circulate nomination papers nominating independent candidates of political bodies or candidates of minor political parties

March 16 — First legal day to file nomination papers nominating indepen-

| | dent candidates of political bodies or candidates of minor political parties |
|--------------|------------------------------|
| March 16 | Secretary of the Commonwealth will transmit to each county board of elections a list of all candidates for Representative in Congress and Delegate or Alternate Delegate to National conventions who have filed nomination petitions with her and who are not known to have withdrawn or been disqualified |
| March 16 | The county boards of elections will deliver or mail to qualified electors who previously have been sent special write-in absentee ballots an additional list containing the names of all candidates for Representative in Congress or Delegate or Alternate Delegate to National conventions who have been named in nomination petitions filed with the Secretary |
| March 19 | Last day to file objections to nomination petitions |
| March 23 | Last day for candidates who have filed nomination petitions to withdraw |
| March 27 | Last day, if possible, that may be fixed by the Commonwealth Court for hearings on objections that have been filed to nomination petitions |
| March 30 | Last day, if possible, for Commonwealth Court to render de- |

cisions in cases involving objec-
tions to nomination petitions

APPENDIX C TO OPINION OF PRESIDENT JUDGE CRAIG
REVISED PRIMARY ELECTION CALENDAR FOR SENATOR
AND REPRESENTATIVE IN THE GENERAL ASSEMBLY

| | |
|---|---|
| March 6 | Last day to circulate and file nomination petitions |
| March 6 | Last day for candidates to file Statements of Financial Interests with the State Ethics Commission |
| March 13 | Last Day to file objections to nomination petitions |
| March 23 | Last day for candidates who have filed nomination petitions for the primary election to withdraw |
| March 27 | Last day, if possible, that may be fixed by Commonwealth Court for hearings on objections that have been filed to nomination petitions |
| March 30 | Last day, if possible, for Commonwealth Court to render decisions in cases involving objections to nomination petitions |

100

Plaintiffs Proposed
Congressional
Plan 2 PENNSY

Plaintiffs Proposed CRT 2
Congressional Plan 2

LVANIA

APPENDIX B TO OPINION OF THE COURT

ORDER

PER CURIAM.

AND NOW, this 10th day of March, 1992, pursuant to hearing held upon complaint, it is hereby ORDERED as follows:

1. The Petition to Intervene filed on behalf of State Senator James C. Greenwood, Andrew L. Warren, Mark S. Schweiker, and Sandra A. Miller is granted. The Petition of Edward J. Wilkes, Jr., Barbara Frailey, William A. Wall, William M. Keim, III, Justus C. Barber, Patricia Anne Buard, and Russell U. McLaughlin for Leave to Intervene is granted.

2. The exceptions to President Judge David W. Craig's Findings, Recommended Decision, and Form of Order filed in this matter are dismissed.

3. Section 1801-A of the Election Code, Act of June 3, 1937, P.L. 1333, added March 3, 1982, P.L. 127, § 2, 25 P.S. § 3571, is hereby declared unconstitutional and its implementation for the purpose of conducting elections to the office of Representative in the United States Congress is hereby permanently enjoined.

4. Such elections, in the primary and general elections in the years 1992, 1994, 1996, 1998 and 2000 shall be conducted in accordance with the Congressional Election Districts described in Appendix A, attached to and hereby made part of this Order, and hereby adopted as the apportionment of the Commonwealth into twenty-one (21) Congressional Districts until the same shall be lawfully changed.

5. The schedule for the primary elections to be held April 28, 1992, for the election of Representatives to the United States Congress and for Delegates and Alternate Delegates to National Conventions, shall be conducted by the Secretary of the Commonwealth and by all election officers within the Commonwealth in accordance with the Revised Election Calendar attached to this Order as Appendix B, and hereby made part hereof, to provide for an orderly election process.

6. In addition, the Secretary of the Commonwealth shall, as soon as possible, publish in the Pennsylvania Bulletin, by description and, if feasible, by maps, the Congressional Districts hereby adopted in Appendix A.

7. The members of Congress now in office shall continue in the office until expiration of their respective terms.

8. Vacancies now existing or happening after the entry of this Order and before the commencement of the terms of the members elected at the election of 1992 shall be filled for the unexpired terms from the districts formerly prescribed in Section 1801–A of the Election Code, Act of June 3, 1937, P.L. 1333, added March 3, 1982, P.L. 127, § 2, 25 P.S. § 3571.

9. In the event any municipality or part thereof should be omitted in the description of congressional districts in Appendix A, the municipality or part thereof shall be included as a part of the congressional district which completely surrounds it. Should any omitted municipality or part thereof be not completely surrounded by one congressional district, it shall become a part of that congressional district to which it is contiguous, or if there are two or more such contiguous districts, it shall become a part of that congressional district contiguous thereto which has the least population.

10. All signatures to nominating petitions for candidates for Representative in the United States Congress, and candidates for Delegate and Alternate Delegate to the National conventions of the political parties obtained before the date of this Order are hereby declared to be void and invalid.

11. The two day mail notice required for the casting of lots pursuant to 25 P.S. § 2875 is hereby waived.

Opinion to follow.

NIX, C.J., and LARSEN and McDERMOTT, JJ., did not participate in the consideration or decision of this case.

APPENDIX A TO ORDER

| DISTRICT NUMBER | DESCRIPTION |
| --- | --- |
| Dist. 01 | DELAWARE and PHILADELPHIA Counties. |

Part of DELAWARE County consisting of the CITY of Chester (Excluding Blocks 201, 207, 208 of 1990 Census Tract 4046) and the TOWNSHIPS of Darby, Ridley (Blocks 903 and 919 of 1990 Census Tract 4041.03) and Tinicum and the BOROUGHS of Colwyn, Eddystone, Folcroft and Glenolden and Part of PHILADELPHIA County consisting of the CITY of Philadelphia (PART, Wards 01, 02 [PART, Divisions, 01, 02, 03, 04, 05, 06, 07, 08, 09, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23 and 26], 05 [PART, Divisions 02, 03, 06, 07, 08, 09, 10, 11, 12, 13, 14, 15, 17, 20, 22 and 23], 07, 10, 11, 12, 13, 14, 16, 17, 19, 20, 26, 30, 32, 36 [PART, Divisions 29, 35 and 37], 37, 39, 40, 43, 47, 48 [PART, Divisions 01, 08, 12, 13, 14, 15 and 17] and 49).
Total population: 565,802

Dist. 02 DELAWARE and PHILADELPHIA Counties.
Part of DELAWARE County consisting of the BOROUGHS of Darby, Lansdowne and Yeadon and Part of PHILADELPHIA County consisting of the CITY of Philadelphia (PART, Wards 03, 04, 06, 08, 09, 15, 21, 22, 24, 27, 28, 29, 34, 36 [PART, Divisions 01, 02, 03, 04, 05, 06, 07, 08, 09, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 30, 31, 32, 33, 34, 36, 38, 39, 40 and 41], 38, 44, 46, 48 [PART, Divisions 02, 03, 04, 05, 06, 07, 09, 10, 11, 16, 18, 19, 20, 21, 22 and 23], 50, 51, 52, 59 and 60).
Total population: 565,815

Dist. 03 PHILADELPHIA County.
Part of PHILADELPHIA County consisting of the CITY of Philadelphia (PART, Wards 02 [PART, Divisions 24, 25 and 27], 05 [PART, Divisions 01, 04, 05, 16, 18, 19 and 21], 18, 23, 25, 31, 33, 35, 41, 42, 45, 53, 54, 55, 56, 57, 58, 61, 62, 63, 64, 65 and 66).
Total population: 565,775

Dist. 04 ALLEGHENY, BEAVER, BUTLER, LAWRENCE and WESTMORELAND Counties.
Part of ALLEGHENY County consisting of the TOWNSHIPS of East Deer, Fawn, Fraz-

er, Harrison, Marshall, Pine, Richland and West Deer and the BOROUGHS of Brackenridge, Bradford Woods, Cheswick, Plum and Tarentum; All of BEAVER County; Part of BUTLER County consisting of the TOWNSHIPS of Adams, Buffalo, Clinton, Cranberry, Jackson and Middlesex and the BOROUGHS of Harmony, Mars, Saxonburg, Seven Fields, Valencia and Zelienople; All of LAWRENCE County and Part of WESTMORELAND County consisting of the CITIES of Arnold, Jeannette, Lower Burrell and New Kensington and the TOWNSHIPS of Allegheny, North Huntingdon, Penn, Salem, Upper Burrell and Washington and the BOROUGHS of Delmont, East Vandergrift, Export, Hyde Park, Irwin, Manor, Murrysville, North Irwin, Penn, Trafford (Westmoreland County Portion) and Vandergrift. Total population: 565,792

Dist. 05

ARMSTRONG, CAMERON, CENTRE, CLARION, CLEARFIELD, CLINTON, CRAWFORD, ELK, FOREST, JEFFERSON, LYCOMING, MCKEAN, POTTER, TIOGA, UNION, VENANGO and WARREN Counties.
Part of ARMSTRONG County consisting of the TOWNSHIP of Madison; All of CAMERON County; Part of CENTRE County consisting of the TOWNSHIPS of Benner, Boggs, College, Curtin, Ferguson, Gregg, Haines, Harris, Howard, Huston, Liberty, Marion, Miles, Patton, Penn, Potter, Spring and Walker and the BOROUGHS of Bellefonte, Centre Hall, Howard, Milesburg, Millheim and State College; Part of CLARION County consisting of the TOWNSHIPS of Ashland, Beaver, Brady, Clarion, Elk, Farmington, Highland, Knox, Licking, Limestone, Madison, Millcreek, Monroe, Paint, Perry, Piney, Porter, Red Bank, Richland, Salem, Toby and Washington and the BOROUGHS of Callensburg, Clarion, East Brady, Foxburg, Hawthorn, Knox, Rimersburg, Shippenville, Sligo, St. Petersburg and Strattanville; Part of CLEARFIELD County consisting of the township of Falls Creek; All of CLINTON County, Part of CRAW-

FORD County consisting of the CITY of Titusville and the TOWNSHIPS of Athens, Bloomfield, East Mead, Oil Creek, Randolph, Rome, Sparta, Steuben, Troy and Wayne and the BOROUGHS of Centerville, Cochranton, Hydetown, Spartansburg and Townville; All of ELK County; All of FOREST County; All of JEFFERSON County; Part of LYCOMING County consisting of the TOWNSHIPS of Anthony, Bastress, Brown, Cogan House, Cummings, Limestone, McHenry, Mifflin, Nippenose, Platt, Pine, Porter, Susquehanna, Washington and Watson and the BOROUGHS of Jersey Shore and Salladasburg; All of MCKEAN County; All of POTTER County; All of TIOGA County; All of UNION County; All of VENANGO County and All of WARREN County.

Total population: 565,813

Dist. 06

BERKS, MONTGOMERY, NORTHUMBERLAND and SCHUYLKILL Counties.

All of BERKS County; Part of MONTGOMERY County consisting of the TOWNSHIPS of Upper Pottsgrove and West Pottsgrove and the BOROUGH of Pottstown (PART, Districts 01, 02, 03, 04, 05 and 07); Part of NORTHUMBERLAND County consisting of the CITY of Sunbury and the TOWNSHIPS of Delaware, East Chillisquaque, Jackson, Jordan, Little Mahanoy, Lower Augusta, Lower Mahanoy, Point, Rockefeller, Turbot, Upper Augusta, Upper Mahanoy and West Chillisquaque and the BOROUGHS of Herndon, McEwensville, Milton, Northumberland, Riverside, Snydertown and Watsontown and All of SCHUYLKILL County.

Total population: 565,786

Dist. 07

CHESTER, DELAWARE and MONTGOMERY Counties.

Part of CHESTER County consisting of the TOWNSHIPS of Charlestown, East Pikeland, East Whiteland, Easttown, Schuylkill, Tredyffrin, West Pikeland, West Vincent and Willistown and the BOROUGHS of Malvern, Phoenixville and Spring City; Part of

108

DELAWARE County consisting of the CITY of Chester (Blocks 201, 207, 208 of 1990 Census Tract 4046) and the TOWNSHIPS of Aston, Bethel, Birmingham, Chester, Concord, Edgemont, Haverford, Lower Chichester, Marple, Middletown, Nether Providence, Newtown, Radnor, Ridley (Excluding Blocks 903 and 919 of 1990 Census Tract 4041.03), Springfield, Thornbury, Upper Chichester, Upper Darby and Upper Providence and the BOROUGHS of Aldan, Brookhaven, Chester Heights, Clifton Heights, Collingdale, East Lansdowne, Marcus Hook, Media, Millbourne, Morton, Norwood, Parkside, Prospect Park, Ridley Park, Rose Valley, Rutledge, Sharon Hill, Swarthmore, Trainer and Upland and Part of MONTGOMERY County consisting of the TOWNSHIP of Upper Merion (Excluding Block 213 of 1990 Census Tract 2059.04) and the BOROUGHS of Bridgeport and Royersford.
Total population: 565,754

Dist. 08

BUCKS and MONTGOMERY Counties.
All of BUCKS County and Part of MONTGOMERY County consisting of the TOWNSHIPS of Horsham and Lower Moreland (PART, District 04).
Total population: 565,787

Dist. 09

BEDFORD, BLAIR, CENTRE, CLEARFIELD, FRANKLIN, FULTON, HUNTINGDON, JUNIATA, MIFFLIN, PERRY and SNYDER Counties.
All of BEDFORD County; All of BLAIR County; Part of CENTRE County consisting of the TOWNSHIPS of Burnside, Halfmoon, Rush, Snow Shoe, Taylor, Union and Worth and the BOROUGHS of Philipsburg, Port Matilda, Snow Shoe, South Philipsburg and Unionville; All of CLEARFIELD County except the TOWNSHIP of Falls Creek; All of FRANKLIN County; All of FULTON County; All of HUNTINGDON County; All of JUNIATA County; All of MIFFLIN County; Part of PERRY County consisting of the TOWNSHIPS of Centre, Jackson, North East Madison, Saville, South West

Madison, Spring, Toboyne, Tuscarora and Tyrone and the BOROUGHS of Blain, Bloomfield and Landisburg and All of SNYDER County.
Total population: 565,803

Dist. 10 BRADFORD, LACKAWANNA, LYCOMING, MONROE, PIKE, SULLIVAN, SUSQUEHANNA, WAYNE and WYOMING Counties.
All of BRADFORD County; All of LACKAWANNA County; Part of LYCOMING County consisting of the CITY of Williamsport and the TOWNSHIPS of Armstrong, Brady, Cascade, Clinton, Eldred, Fairfield, Franklin, Gamble, Hepburn, Jackson, Jordan, Lewis, Loyalsock, Lycoming, McIntyre, McNett, Mill Creek, Moreland, Muncy, Muncy Creek, Old Lycoming, Penn, Plunketts Creek, Shrewsbury, Upper Fairfield, Wolf and Woodward and the BOROUGHS of Duboistown, Hughesville, Montgomery, Montoursville, Muncy, Picture Rocks and South Williamsport; Part of MONROE County consisting of the TOWNSHIPS of Barrett, Coolbaugh, Jackson, Middle Smithfield, Paradise, Pocono, Price and Smithfield and the BOROUGHS of Delaware Water Gap, East Stroudsburg (PART, Districts 02 and 03) and Mt. Pocono; All of PIKE County; All of SULLIVAN County; All of SUSQUEHANNA County; All of WAYNE County and All of WYOMING County.
Total population: 565,796

Dist. 11 CARBON, COLUMBIA, LUZERNE, MONROE, MONTOUR and NORTHUMBERLAND Counties.
All of CARBON County; All of COLUMBIA County; All of LUZERNE County; Part of MONROE County consisting of the TOWNSHIPS of Chestnuthill, Eldred, Hamilton, Polk, Ross, Stroud, Tobyhanna and Tunkhannock and the BOROUGHS of East Stroudsburg (PART, Districts 01, 04, 05 and 06) and Stroudsburg; All of MONTOUR County and Part of NORTHUMBERLAND County consisting of the CITY of Shamokin and the TOWNSHIPS of Coal, East Camer-

on, Lewis, Mt. Carmel, Ralpho, Rush, Shamokin, Washington, West Cameron and Zerbe and the BOROUGHS of Kulpmont, Marion Heights, Mt. Carmel and Turbotville. Total population: 565,798

Dist. 12

ARMSTRONG, CAMBRIA, CLARION, FAYETTE, INDIANA, SOMERSET and WESTMORELAND Counties.
Part of ARMSTRONG County consisting of the TOWNSHIPS of Bethel, Boggs, Bradys Bend, Burrell, Cadogan, Cowanshannock, East Franklin, Gilpin, Hovey, Kiskiminetas, Kittanning, Mahoning, Manor, North Buffalo, Parks, Perry, Pine, Plumcreek, Rayburn, Redbank, South Bend, South Buffalo, Sugarcreek, Valley, Washington, Wayne and West Franklin and the BOROUGHS of Apollo, Applewold, Atwood, Dayton, Elderton, Ford City, Ford Cliff, Freeport, Kittanning, Leechburg, Manorville, North Apollo, Parker City, Rural Valley, South Bethlehem, West Kittanning and Worthington; All of CAMBRIA County; Part of CLARION County consisting of the BOROUGH of New Bethlehem; Part of FAYETTE County consisting of the CITY of Connellsville and the TOWNSHIPS of Connellsville, Dunbar, Georges, Henry Clay, North Union, Springfield, Stewart and Wharton and the BOROUGHS of Dunbar, Fairchance, Markleysburg, Ohiopyle, Smithfield, South Connellsville and Vanderbilt; All of INDIANA County; All of SOMERSET County and Part of WESTMORELAND County consisting of the TOWNSHIPS of Bell, Cook, Derry, Donegal, East Huntingdon, Fairfield, Ligonier, Loyalhanna, Mt. Pleasant, St. Clair and Unity and the BOROUGHS of Avonmore, Bolivar, Derry, Donegal, Latrobe, Laurel Mountain, Ligonier, Mt. Pleasant, New Alexandria, New Florence, Oklahoma, Scottdale, Seward, West Leechburg and Youngstown.
Total population: 565,794

Dist. 13

MONTGOMERY County.
Part of MONTGOMERY County consisting of the TOWNSHIPS of Abington, Chelten-

ham, East Norriton, Franconia, Hatfield, Limerick, Lower Frederick, Lower Gwynedd, Lower Merion, Lower Moreland (PART, Districts 01, 02, 03, 05 and 06), Lower Pottsgrove, Lower Providence, Lower Salford, Marlborough, Montgomery, Perkiomen, Plymouth, Salford, Skippack, Springfield, Towanmencin, Upper Dublin, Upper Gwynedd, Upper Merion (Block 213 of 1990 Census Tract 2059.04), Upper Moreland, Upper Providence, Upper Salford, West Norriton, Whitemarsh, Whitpain and Worcester and the BOROUGHS of Ambler, Bryn Athyn, Collegeville, Conshohocken, Hatboro, Hatfield, Jenkintown, Lansdale, Narberth, Norristown, North Wales, Pottstown (PART, District 06), Rockledge, Schwenksville, Souderton, Telford (Montgomery County Portion), Trappe and West Conshohocken.
Total population: 565,767

Dist. 14

ALLEGHENY County.
Part of ALLEGHENY County consisting of the CITY of Pittsburgh and the TOWNSHIPS of Aleppo, Collier, Hampton, Kennedy, Kilbuck, Leet, McCandless, Neville, Ohio, Robinson, Ross and Stowe and the BOROUGHS of Avalon, Bell Acres, Bellevue, Ben Avon, Ben Avon Heights, Crafton, Edgewood, Emsworth, Franklin Park, Green Tree, Homestead, Ingram, Leetsdale, McKees Rocks, Mt. Oliver, Pennsbury Village, Rosslyn Farms, Sewickley Heights, Sewickley Hills, Thornburg and West View.
Total population: 565,787

Dist. 15

LEHIGH, MONTGOMERY and NORTHAMPTON Counties.
All of LEHIGH County; Part of MONTGOMERY County consisting of the TOWNSHIPS of Douglass, New Hanover, Upper Frederick and Upper Hanover and the BOROUGHS of East Greenville, Green Lane, Pennsburg and Red Hill and All of NORTHAMPTON County.
Total population: 565,810

112

Dist. 16 CHESTER and LANCASTER Counties.
 Part of CHESTER County consisting of the
 CITY of Coatesville and the TOWNSHIPS
 of Birmingham, Caln, East Bradford, East
 Brandywine, East Caln, East Coventry, East
 Fallowfield, East Goshen, East Marlbor-
 ough, East Nantmeal, East Nottingham,
 East Vincent, Elk, Franklin, Highland, Ho-
 neybrook, Kennett, London Britain, London
 Grove, Londonderry, Lower Oxford, New
 Garden, New London, Newlin, North Coven-
 try, Penn, Pennsbury, Pocopson, Sadsbury,
 South Coventry, Thornbury, Upper Oxford,
 Upper Uwchlan, Uwchlan Valley, Wallace,
 Warwick, West Bradford, West Brandywine,
 West Caln, West Fallowfield, West Goshen,
 West Marlborough, West Nantmeal, West
 Nottingham, West Sadsbury, West White-
 land and Westtown and the BOROUGHS of
 Atglen, Avondale, Downingtown, Elverson,
 Honey Brook, Kennett Square, Modena, Ox-
 ford, Parkesburg, South Coatesville, West
 Chester and West Grove and Part of LAN-
 CASTER County consisting of the CITY of
 Lancaster and the TOWNSHIPS of Bart,
 Brecknock, Caernarvon, Colerain, Drumore,
 Earl, East Cocalico, East Drumore, East
 Earl.

| East Hempfield | [PART, | Districts | |
|---|---|---|---|
| Barrcrest | (1990), | Centerville | (1990), |
| Cherry Hill | (1990), | Chestnut Ridge | (1990), |
| Friendly | (1990), | Golden Acres | (1990), |
| Kings | (1990), | Landisville | (1990), |
| Petersburg | (1990), | Pleasant View | (1990) and |
| Rohrerstown | (1990) ], | | |

 East Lampeter, Eden, Fulton, Lancaster,
 Leacock, Little Britain, Manheim, Martic,
 Paradise, Pequea, Providence, Sadsbury,
 Salisbury, Strasburg, Upper Leacock, War-
 wick, West Cocalico, West Earl and West
 Lampeter and the BOROUGHS of Adams-
 town (Lancaster County Portion), Christia-
 na, Denver, East Petersburg, Lititz, Millers-
 ville, New Holland, Quarryville, Strasburg
 and Terre Hill.
 Total population: 565,804

Dist. 17 CUMBERLAND, DAUPHIN, LANCAS-
 TER, LEBANON and PERRY Counties.
 Part of CUMBERLAND County consisting
 of the TOWNSHIPS of East Pennsboro,

Hampden (PART, Precincts 02a, 02b, 03, 04 and 05) and Silver Spring and the BOROUGHS of Mechanicsburg and Shiremanstown; All of DAUPHIN County; Part of LANCASTER County consisting of the TOWNSHIPS of Clay, Conestoga, Conoy, East Donegal, East Hempfield [PART, Districts

| | | | |
|---|---|---|---|
| Hempland | (1990), | Indian Springs | (1990), |
| Millcreek | (1990) | and Scotland | (1990) ], |

Elizabeth, Ephrata, Manor, Mt. Joy, Penn, Rapho, West Donegal and West Hempfield and the BOROUGHS of Akron, Columbia, Elizabethtown, Ephrata, Manheim, Marietta, Mountville and Mt. Joy; All of LEBANON County and Part of PERRY County consisting of the TOWNSHIPS of Buffalo, Carroll, Greenwood, Howe, Juniata, Liverpool, Miller, Oliver, Penn, Rye, Watts and Wheatfield and the BOROUGHS of Duncannon, Liverpool, Marysville, Millerstown, New Buffalo and Newport.
Total population: 565,817

Dist. 18

ALLEGHENY County.
Part of ALLEGHENY County consisting of the CITIES of Clairton, Duquesne and McKeesport and the TOWNSHIPS of Baldwin, Elizabeth, Forward, Harmar, Indiana, Mt. Lebanon, North Versailles, O'Hara, Penn Hills, Reserve, Scott, Shaler, South Park, South Versailles, Springdale and Wilkins and the BOROUGHS of Aspinwall, Baldwin, Blawnox, Braddock, Braddock Hills, Brentwood, Carnegie, Castle Shannon, Chalfant, Churchill, Dormont, Dravosburg, East McKeesport, East Pittsburgh, Elizabeth, Etna, Forest Hills, Fox Chapel, Glassport, Heidelberg, Jefferson, Liberty, Lincoln, Millvale, Monroeville, Munhall, North Braddock, Oakmont, Pitcairn, Pleasant Hills, Port Vue, Rankin, Sharpsburg, Springdale, Swissvale, Trafford (Allegheny County Portion), Turtle Creek, Verona, Versailles, Wall, West Elizabeth, West Homestead, West Mifflin, Whitaker, White Oak, Whitehall, Wilkinsburg and Wilmerding.
Total population: 565,781

114

Dist. 19 ADAMS, CUMBERLAND and YORK Counties.

All of ADAMS County; Park of CUMBERLAND County consisting of the TOWNSHIPS of Cooke, Dickinson, Hampden (PART, Precincts 01 North and 01 South), Hopewell, Lower Allen, Lower Frankford, Lower Mifflin, Middlesex, Monroe, North Middleton, North Newton, Penn, Shippensburg, South Middleton, South Newton, Southampton, Upper Allen, Upper Frankford, Upper Mifflin and West Pennsboro and the BOROUGHS of Camp Hill, Carlisle, Lemoyne, Mt. Holly Springs, New Cumberland, Newburg, Newville, Shippensburg (Cumberland County Portion), West Fairview and Wormleysburg and All of YORK County.

Total population: 565,779

Dist. 20 ALLEGHENY, FAYETTE, GREENE, WASHINGTON and WESTMORELAND Counties.

Part of ALLEGHENY County consisting of the TOWNSHIPS of Crescent, Findlay, Moon, North Fayette, South Fayette and Upper St. Clair and the BOROUGHS of Bethel Park, Bridgeville, Coraopolis, Edgeworth, Glenfield, Haysville, McDonald (Allegheny County Portion), Oakdale, Osborne and Sewickley; Part of FAYETTE County consisting of the CITY of Uniontown and the TOWNSHIPS of Brownsville, Bullskin, Franklin, German, Jefferson, Lower Tyrone, Luzerne, Menallen, Nicholson, Perry, Redstone, Saltlick, South Union, Springhill, Upper Tyrone and Washington and the BOROUGHS of Belle Vernon, Brownsville, Dawson, Everson, Fayette City, Masontown, Newell, Perryopolis and Point Marion; All of GREENE County; All of WASHINGTON County and Part of WESTMORELAND County consisting of the CITIES of Greensburg and Monessen and the TOWNSHIPS of Hempfield, Rostraver, Sewickley and South Huntingdon and the BOROUGHS of Adamsburg, Arona, Hunker, Madison, New Stanton, North Belle Vernon, Smithton, South Greensburg, Southwest Greens-

burg, Sutersville, West Newton and Young-wood.
Total population: 565,815

Dist. 21 — BUTLER, CRAWFORD, ERIE and MER-CER Counties.
Part of BUTLER County consisting of the CITY of Butler and the TOWNSHIPS of Allegheny, Brady, Butler, Center, Cherry, Clay, Clearfield, Concord, Connoquenessing, Donegal, Fairview, Forward, Franklin, Jefferson, Lancaster, Marion, Mercer, Muddy-creek, Oakland, Parker, Penn, Slippery Rock, Summit, Venango, Washington, Winfield and Worth and the BOROUGHS of Bruin, Callery, Cherry Valley, Chicora, Connoquenessing, East Butler, Eau Claire, Evans City, Fairview, Harrisville, Karns City, Petrolia, Portersville, Prospect, Slippery Rock, West Liberty and West Sunbury; Part of CRAWFORD County consisting of the CITY of Meadville and the TOWN-SHIPS of Beaver, Cambridge, Conneaut, Cussewago, East Fairfield, East Fallowfield, Fairfield, Greenwood, Hayfield, North Shenango, Pine, Richmond, Rockdale, Sadsbury, South Shenango, Spring, Summerhill, Summit, Union, Venango, Vernon, West Fallowfield, West Mead, West Shenango and Woodcock and the BOROUGHS of Blooming Valley, Cambridge Springs, Conneaut Lake, Conneautville, Linesville, Saegertown, Springboro, Venango and Woodcock; All of ERIE County and All of MERCER County.
Total population: 565,802

Population of all districts: 11,881,643

APPENDIX B TO ORDER

**REVISED ELECTION CALENDAR FOR REPRESENTATIVE IN UNITED STATES CONGRESS AND DELEGATE AND ALTERNATE DELEGATE TO NATIONAL CONVENTIONS**

| | |
|---|---|
| March 10 | First legal day to circulate and file nomination petitions |
| March 11 | Secretary of the Commonwealth will send to the county boards of |

elections a written notice announcing that candidates are to be nominated at the April 28, 1992 primary for the office of Representative in Congress

March 11 — Secretary of the Commonwealth will send to the county boards of elections a written notice announcing that candidates are to be elected at the April 28, 1992 primary for the party offices of Delegate and Alternate Delegate to the National conventions of the political parties and designating the number of such offices to be elected in each congressional district

March 17 — The county boards of elections will publish a notice in newspapers that nominations of candidates for Representative in Congress will be made and that elections of persons to the party offices of Delegate and Alternate Delegate to National conventions of the political parties will occur at the April 28, 1992 General Primary, such notice to specify that the Court has established a deadline of March 19, 1992 by which nomination petitions for such offices must be filed

March 19 — Last day to circulate and file nomination petitions

March 20 — First legal day to circulate nomination papers nominating independent candidates of political bodies or candidates of minor political parties

March 20 — First legal day to file nomination papers nominating independent candidates of political bodies or candidates of minor political parties

March 20 — Secretary of the Commonwealth will transmit to each county board of elections a list of all candidates for Representative in Congress and

| | Delegate or Alternate Delegate to National conventions who have filed nomination petitions with the Secretary of the Commonwealth and who are not known to have withdrawn or been disqualified |
|---|---|
| March 23 | The county boards of elections will deliver or mail to qualified electors who previously have been sent special write-in absentee ballots an additional list containing the names of all candidates for Representative in Congress or Delegate or Alternate Delegate to National conventions who have been named in nomination petitions filed with the Secretary |
| March 24 | Last day for candidates who have filed nomination petitions to withdraw |
| March 25 | Last day to file objections to nomination petitions |
| March 31 | Last day that may be fixed by the Commonwealth Court for hearings on objections that have been filed to nomination petitions |
| April 3 | Last day for Commonwealth Court to render decisions in cases involving objections to nomination petitions |
| May 8 | Last day for acceptance of absentee ballots for all elections |

APPENDIX C TO OPINION OF THE COURT

## EXCEPTIONS

### A. *Exceptions of F. JOSEPH LOEPER, et al.*

1) Erred in enforcing an arbitrary deadline for submission of redistricting plan.

2) Finding of Fact 15 is erroneous insofar as it characterizes the proceeding involving the amended version of the Loeper Plan.

3) Erred in excluding the amended Loeper Plan for consideration.

4) Finding of Fact 16 is erroneous in that the record contains no evidence to support the findings as to party registration balance for all the listed statewide plans, except the Loeper Plan. Finding of Fact 16 is also erroneous in stating the maximum and average deviation of the Murtha–McDade Plan as well as in stating the number of precincts split by that plan as being 22 rather than 30.

5) Fails to make adequate findings regarding the protection of minority voting rights from dilution.

6) Erred in failing to make findings regarding the dilution in minority population that would be effected in Allegheny County by all statewide plans accepted for consideration.

7) Erred in the legal standard applied to the selection process. Standard used was one arguably appropriate for legislatively enacted reapportionment plans. Master should have selected a plan that approached equality of population as nearly as practicable while also protecting voting rights.

8) The recommended plan by the Master has an unacceptably high deviation from equal population.

9) Erred in relying on maximum and average deviation for the selected plan.

10) Erred in recommending a plan for Allegheny County that produces a result contrary to the Findings of Fact at Nos. 27 and 28.

11) Erred in recommending the elimination of the present 5th District and in effectively eliminating the present 18th District since every other district west of the Alleghenies suffered a greater population decline.

12) Erred in *not* recommending the adoption of the amended Loeper Plan.

Intervenors request the adoption of the amended Loeper Plan or the Court to design its own plan or remand to the Master for further proceedings.

### B. Exceptions of MATTHEW J. RYAN, et al.

1) Erred in using artificial deadlines to exclude plans and amendments filed after the February 11, 1992 date.

2) Erred in excluding consideration of the Ryan–Cornell Plan first offered publicly in the House on February 11, 1992.

3) Erred in choosing a plan having an unacceptable maximum range of deviation, which dilutes minority voting strength in District 2 in Philadelphia and District 14 in Allegheny County, fragments municipalities and is not compact nor contiguous.

4) Erred in permitting an incomplete record be made on the dilution of minority voting strength.

Joins with Loeper Exceptions Nos. 1, 2, 3, 4, 5, 7, 8, 9, 10 and 11.

5) Argues that their plan is superior to the Loeper Plan.

### C. Exceptions of ROBERT W. O'DONNELL

1) Erred by ignoring constitutional requirement of using the lowest population deviation practicable in favor of a standard of "acceptability in terms of population equality."

2) Erred by treating all the submitted plans as having the same population deviation. Argues that the Plaintiffs' Plan No. 2 deviation could have been further reduced by selecting the O'Donnell Plan B.

3) Erred in interpreting and applying the federal Voting Rights Act in concluding that it is required to create minority-in-the-majority districts. Argues that the record reflects the conclusion that two black majority districts can be created.

4) Recommended plan dilutes minority voting strength in the Second Congressional District in violation of Section 2 of the Voting Rights Act.

5) Erred by equating subjective expressions of "regional interest" with constitutional requirements of population equality.

6) Erred in determining that the Murtha–McDade Plan is the only bi-partisan plan.

7) Erred in finding for a second African–American majority district in Philadelphia based on population proportions.

8) Erred by not correcting reported deviation adjustments.

D. *Exceptions of EDWARD J. WILKES, JR., et al.*

1) Division of Township of Upper Merion into two congressional districts violates Article 1, Section 2 and the First and Fourteenth Amendments, Article I, Sections 5 and 26 of the Pennsylvania Constitution since the plan fragments the Township of Upper Merion; disenfranchises voters and interferes with voters' right to free and equal elections.

2) Upper Merion division violates the First, Fifth and Fourteenth Amendments, Article I, Section 5 of the Pennsylvania Constitution because it forces the Township to spend additional time and money to establish liaison for two separate representatives for 109 residents in a district separate from the remainder of the Township.

3) Upper Merion division violates the Fourteenth Amendment because it is not supported by a rational basis or related to any necessary governmental interest.

4) Impairs voters' rights in violation of the First and Fourteenth Amendments because the division results in unnecessary expense in conducting elections, financing and staffing campaigns and might lead to confusion in voting.

5) Erred by not considering the hardship the recommended plan would have on the Township.

E. *Exceptions of Amicus Curiae, THOMAS A. FOGLIETTA, et al.*

Argues for remand for a new plan which was also submitted.

F. *Submission of Intervenors, JOHN P. MURTHA and JOSEPH W. McDADE*

They argue:

1) The bi-partisan statewide congressional plan is constitutionally preferable to party caucus plans prepared for partisan political advantage.

2) Only the bi-partisan plan accomplishes the constitutionally-mandated minimum deviation of less than one person per district.

3) There is no evidence in the record to implicate the provisions of the Voting Rights Act as respects the present configuration of the Second Congressional District in Philadelphia.

4) The bi-partisan plan complies with the policies of the Voting Rights Act.

G. *Amicus Curiae, WILLIAM H. LAMB*

Argues against the splitting of Chester County in Plaintiffs' Plan No. 2.

H. *Amicus Curiae, JERRY B. FULMER*

Argues against the splitting of communities in Allegheny County in Plaintiffs' Plan No. 2.